**W.B. TICHENOR, Appellant,**

v.

**MISSOURI STATE LOTTERY COMMISSION, et al., Respondents.**

**No. 69992.**

Supreme Court of Missouri, En Banc.

Jan. 5, 1988.

Duane Benton, Jefferson City, for appellant.

William L. Webster, Atty. Gen., David G. Edwards, Asst. Atty. Gen., Jefferson City, for respondents.

BLACKMAR, Judge.

The Missouri constitutions of 1865, 1875, and 1945 contained strict provisions against lotteries.[1] These provisions have been gradually eroded in recent years, as the state has tried to fill its coffers from the pockets of willing gamblers in preference to further burdening the reluctant taxpayers.[2] At the 1984 general election the voters approved an amendment submitted by the legislature authorizing the general assembly to establish a "Missouri state lottery." Mo. Const. Art. III, Sec. 39(b).

The constitutional provision was not self enforcing, and the general assembly adopted enabling legislation at its next session, establishing the Missouri Lottery

1. Art. IV, Sec. 28 (1865); Art. XIV, Sec. 10 (1875); Art. III, Sec. 39(9) (1945). As to the policy of the state, *See, Mobil Oil Corporation v. Danforth,* 455 S.W.2d 505 (Mo. banc 1970).

2. *See,* Art. 3, Sec. 39(c), Mo. Const. (authorizing pari-mutuel betting on horse racing); 313.530, RSMo 1986 (all revenues from the licensing of race tracks shall be deposited in the state treasury). *See Barnes v. Bailey,* 706 S.W.2d 25 (Mo. banc 1986).

Commission and enjoining it to proceed so that "a lottery may be initiated at the earliest feasible and practicable time." L.1985, S.B. 44; Sec. 313.200–250, 220, RSMo 1986. The commission then approved and instituted various lottery games. Also in accord with the constitutional imperative, a maximum of 45% of the proceeds of ticket sales is distributed as prizes; a maximum of 10% is allocated for expenses, and a minimum of 45% is designated for the general revenue fund of the state treasury. Art. III, Sec. 39(b)(3), Mo. Const. The general assembly appropriated "start-up" money to get the enterprise in operation, but its power to do so was limited to the first year of operation and the advances must be repaid out of lottery proceeds within two years. Section 313.330, RSMo 1986. The lottery is now wholly dependent upon the yield from ticket sales, and no additional funds may now be appropriated. Section 313.321, RSMo 1986.

The lottery did not produce as hoped and the commissioners were vexed because Missourians have continued to venture large sums in lotteries with more attractive prize structures sponsored by neighboring states. They saw a solution in a proposed "Multi–State Lottery," in which a consortium of states would contribute to an attractive prize pool, to be awarded in a drawing for which all ticketholders in the participating states would be eligible. The commissioners sought statutory authority. The proposals cleared several legislative hurdles but fell short of enactment at the 1987 session of the general assembly. The commissioners then proceeded on their own initiative, entering into an agreement designed to bring Missouri into the multi-state lottery by February of 1988.

By the terms of this agreement the Missouri commission will receive all the proceeds from lottery tickets sold in this state, as in the past. Forty-five percent of the proceeds will be allocated to the state treasury and 10% will be retained for expenses. The balance will be transmitted to the managers of the multi-state enterprise, with its headquarters in Des Moines, Iowa, for inclusion in its pool. Holders of tickets purchased in Missouri may win prizes to which

the other participating states have contributed, or the Missouri proceeds may benefit players in other states, depending on the luck of the draw. It is possible that prospects in other states will be lured by advertisements which would not be permissible by Missouri's strict standards, but there will be no advertising in Missouri which violates our constitutional or statutory provisions. No state funds will be appropriated to facilitate Missouri's participation in the multi-state lottery, but the commission has expended funds in its possession, presumably out of the 10% allocated for expenses, to "explore, join and participate in the multistate lottery," and no doubt will continue to do so. The commission estimates that as much as $300,000 may be so expended.

Even though a net gain from the multi-state lottery is expected and no money will be taken from the state treasury, we believe that the funds of the lottery commission are "state funds" in the broad sense, and that the plaintiff as a citizen and taxpayer of Missouri has standing to challenge the legality of these expenditures in court. *Berghorn v. Reorganized School District No. 8*, 364 Mo. 121, 260 S.W.2d 573, 581 (1953); *Missourians for Separation of Church and State v. Robertson*, 592 S.W.2d 825, 839 (Mo.App.1979). He alleges that Missouri's participation in a multi-state lottery is illegal by reason of several provisions of the state and federal constitutions and statutes.

The case was tried on stipulated facts. The trial court found that the plaintiff's points were not well taken and entered judgment denying the relief sought, without additional findings or opinion. The plaintiff appealed to this Court, suggesting that we have initial jurisdiction because the proposed action involves possible conflict with a provision of the constitution of this state (Article III, Sec. 39(b)), and because the construction of revenue laws of this state (Sec. 313.200 to 313.350, RSMo 1986) is required.

Although the jurisdictional grounds assigned are not pellucid, we conclude that

the notice of appeal was filed in entire good faith and proceed to decide the case without further jurisdictional inquiry because of the importance of the questions presented. Mo. Const. Art. V, Secs. 3, 4; *Sermchief v. Gonzales*, 660 S.W.2d 683 (Mo. banc 1983). We are greatly helped by the excellent briefing and oral argument by counsel for both sides, on an expedited schedule. We find that the proposed entry into the multi-state lottery is not facially invalid for any of the reasons assigned, and affirm the judgment of the circuit court.

## I.

■ It is first argued that the phrase "Missouri state lottery" as used in the constitution is a limitation on the authority of the legislature and of the commission, and that a lottery in which the proceeds of sales of Missouri tickets go into a pot which may be won by a person who has purchased a ticket in another state, and in which Missouri residents may win prizes to which ticket purchasers in other states contribute, cannot be brought within the compass of the constitutional designation. This point, if well taken, is dispositive of the case. Neither the legislature nor the commission may establish a lottery which is not within the constitutional authority.

The plaintiff-appellant argues that the constitutional authorization should be construed strictly because it represents an exception to the historic Missouri policy against lotteries and gambling enterprises of all kinds. The defendant officials contend, contrariwise, that the voters of the state showed that they wanted a lottery and that the constitutional authorization should be liberally construed to give effect to this authorization. We suggest that the words should be read in accordance with their plain meaning, so as to carry out the purpose manifested by the voters of the state in approving the amendment referred to them by the general assembly.[3] By reason of the amendment, a lottery in which all the profits inure to the benefit of the state of Missouri accords with the public policy of the state, rather than contravening it. We should not construe the constitutional provision in such a way as to thwart the voters' purpose, and should impose only such restrictions as are clearly required by the statute.

The intent we look to, furthermore, is that of the voters. The legislature may only lay a proposed constitutional amendment before the electorate. Its intent is immaterial except to the extent that it may be found in the text of the proposal actually placed on the ballot. Thus the circumstance that an earlier legislative proposal contained language which might be more readily supportive of the authority to participate in a multi-state lottery enterprise is of little moment. Nor is it significant that the full text of the amendment does not appear on the ballot. The text is available to the voters, at the polling place and elsewhere. The text is our only authentic basis for ascertaining intent.

The plaintiff points out that, if the commission's proposal is upheld, the proceeds from Missouri tickets may be awarded as prizes to non-Missourians. This is not an important circumstance. The basic purpose of the Missouri state lottery is to lift money from the pockets of Missourians, not to reward them. The prizes are only a means to this end. Out-of-state residents are welcome to purchase tickets and to receive prizes in the present lottery operations, if they can handle the logistics.

The plaintiff points to constitutional and statutory provisions in other states which explicitly authorize multi-state lotteries. The fact that the framers of the amendment might have relieved us of the construction problem by doing a better job of drafting does not require us to indulge in a narrow reading of their composition. The manifest purpose was to permit the legislature to establish a lottery for the benefit of the state treasury. Restrictions deemed necessary in the public interest are clearly

---

**3.** Cases construing other constitutional amendments are of little help, because they involve very different fact situations. *See,* however, *Boone County Court v. State*, 631 S.W.2d 321, 324 (Mo. banc 1982); *Roberts v. McNary*, 636 S.W.2d 332, 335 (Mo.1982); *Barnes v. Bailey*, 706 S.W.2d 25 (Mo. banc 1986).

phrased. We should hesitate to imply restrictions which are not expressly stated.

We conclude that the phrase "Missouri state lottery" should not be read as a limitation on the authority of the State Lottery Commission to enter into a multi-state lottery venture otherwise complying with the details of the Missouri statute. The proposal accords with the clearly stated limitations on distribution of proceeds and advertising. The language, "Missouri state lottery," serves a substantial purpose in telling us that the general assembly may not authorize a lottery for the benefit of a political subdivision, or a charitable or private interest. The plaintiff's fears that a decision against his position would open the door to joint aleatory ventures with other entities within the state, therefore, are groundless. · On considering the whole record, we are unable to say that the voters intended to restrict the legislature and the commission in the way the plaintiff suggests.

### II.

█ The plaintiff argues that the commission, by entering into the multi-state lottery agreement, countenances an impairment of the sovereignty of Missouri as a free and independent state by delegating state authority to a managing body which includes representatives of the other participating states. ·Mo. Const. Art. I, Sec. 4. We reject the claim. The commission may enter into the agreement or not, as it determines. It retains full authority over the preparation, sale and distribution of tickets within Missouri and over the application of the proceeds. It may withdraw from the agreement at any time, without advance notice, if there is a violation of any provision of the Missouri Constitution or ·statutes. It has the discretion to adopt or to reject game rules prescribed by the multi-state board. The only consequence of rejection would be possible disqualification from further participation in the multi-state

lottery, which would certainly not be disturbing to this plaintiff.

Nor do we perceive an impermissible pledging of the state's credit, or of the credit of the commission as a state agency, in violation of the Missouri Constitution.[4]· The stipulation states that the state treasury's statutory share of the proceeds will be paid over, and that the interstate pool will be augmented only out of the proportion of the proceeds which is available for prize money. Any attempt to impose a general obligation of the state on account of the multi-state lottery would be invalid and ineffective. There is no violation of Art. III, Sec. 39(4), prohibiting the payment of claims against the state by reason of a contract made without express authority of law, because the agreement does not authorize any claim against the state. Paragraph 6 of Art. III, Sec. 39(b) states that proceeds of the lottery are not a part of "total state revenues as defined in Sections 17 and 18 of Article X of the Missouri Constitution," and that expenditures are not an "expense of state government" under Article X, Sec. 20. Although the cited provisions have a restricted purpose, being part of the so-called "Hancock Amendment," the characterizations are helpful in demonstrating the voters' understanding as to the nature of the funds generated.

### III.

█ The plaintiff argues that the proposed agreement is invalid for want of statutory authority. The governing statutes, however, do not impose restrictions over and above the constitutional restrictions on the kinds of lottery games which may be utilized.[5] Their purpose, rather, is to facilitate the institution of the lottery to the full extent authorized by the voters. *See* Section 313.220. Nothing in the language of the governing statutes inhibits participation in a multi-state lottery.

The plaintiff makes much of the circumstance that the commission sought legisla-

---

4. Mo. Const. Art. 3, secs. 38(a), 39(1), (2).

5. Section 313.230(1)(a) excludes casino-type games and coin or token operated amusement

devices which are not within the usual understanding of the term "lottery."

tion at the 1987 regular session of the general assembly which would explicitly authorize participation in the multi-state lottery, and that the legislation did not pass. Proceedings in a subsequent legislative session have no effect on the construction of the governing constitutional provisions or of statutes previously adopted. A subsequent legislature is without authority to alter the work of a prior one except by a bill duly enacted. Proposed legislation fails of passage for a number of reasons. It makes no difference how far it progresses in the legislative pipeline, unless it is enacted. Nor is the circumstance that many members of a later general assembly served in the assembly which adopted or referred the legislation of great value as an aid to construction. Interested parties may, and should, seek clarification without being saddled with a binding admission. The plaintiff cites *Bressler v. Tietjen*, 424 S.W.2d 65, 70 (Mo. banc 1968), in which the Court considered futile legislative efforts of an administrative agency in successive legislative sessions to have some weight in determining whether the agency could lawfully accomplish the same purpose by rule. There were alternate grounds for the decision and the authority is not a strong one for the plaintiff's contentions. Likewise without legal significance are the concurrences of the governor and of legislative committees in the multi-state proposal, adduced by respondent. We must decide the case, in the last analysis, by reference to the legislation as it is written.

The plaintiff goes on to argue, however, that the statutes require the commission to adopt regulations governing, among other things, the "type of lottery to be conducted," and to submit these regulations to the general assembly's joint committee on administrative rules for approval. Sec. 313.-220. No rules specifically relating to the multi-state lottery have been promulgated, submitted, or approved. The plaintiffs contend that the commission has no authority to conduct or participate in any type of lottery which is not the subject of an approved rule, citing the definition of "lottery game" in Section 313.205(7).[6]

This contention is troubling. The commission could have made our task easier if it had adopted rules relating to the multistate lottery and had submitted them to the joint committee. It may still do so: We are unable to conclude, however, that the expenditures of which the plaintiff complains are illegal simply because the commission has not adopted rules which refer specifically to the multi-state lottery.

Section 313.220 reads in pertinent part as follows:

> The commission shall promulgate such rules and regulations governing the establishment and operation of a state lottery *as it deems necessary and desirable to fully implement the mandate of the people expressed in the approval of the lottery amendment* to article III of the Missouri Constitution at the general election in November, 1984. Such rules and regulations shall be designed so that a lottery may be initiated at the earliest feasible and practicable time. No rule or portion of a rule promulgated under this authority shall become effective until it has been approved by the joint committee on administrative rules. Any rule or portion of a rule promulgated under this authority may be suspended by the joint committee on administrative rules at any time. (Emphasis supplied).

It is not the purpose of this section to give the joint committee the authority to maintain a continuing supervision over the operations of the commission, or a veto power over the games the commission approves. Although the general assembly may authorize the lottery or not, as it thinks wise, the structure of the commission is dictated by the constitution and the legislature has no power to modify this structure. We sense no purpose in the enabling legislation of limiting the commission's authority to approve and institute any lottery game, except for "casino type games or any coin or token operated

---

6. "Lottery game" or "game", any procedure authorized by written rule of the commission whereby prizes are distributed among persons who have paid, or have unconditionally agreed to pay, for tickets or shares which provide the opportunity to win such prizes;

amusement device," which the statute expressly excludes from the definition of lottery, and are probably at variance with the generally understood meaning of the term. Section 313.230(1)(a). Under this construction, the joint committee is without power to forbid the commission to institute any lottery game permitted by the constitution and statutes. Any contrary holding would present substantial constitutional problems of separation of power. Mo. Const., Art. II, Sec. 1.

Section 313.230 lists the "Duties of Commission" and imposes a duty to (1) issue "rules and regulations concerning the operation of the Missouri state lottery." Nothing is said as to whether the rules and regulations adopted pursuant to this section are required to be approved by the joint committee, in the manner of rules and regulations required by Section 313.220. It is arguable that Section 313.229 rules are limited to those necessary to get the lottery started, and that Section 313.230 confers the authority to adopt strictly operational rules without resort to the joint committee. It is evident that the decision as to whether rules are necessary is initially for the commission to make. It well might conclude that on-line games of the type contemplated for the multi-state lottery are authorized by 12 C.S.R. 40–85.055, adopted and submitted to the joint committee, and reading as follows:

(1) The director shall publish the following specifics for each on-line game at least one (1) week prior to the start of that game:

The multi-state game is similar to games presently operated by the commission. Examples of some different types of games are found in 313.230. The multi-state game would be an "on line" game quite similar to the lottery presently conducted by the commission.

The plaintiff has not demonstrated that participation in the multi-state lottery is invalid for want of a sufficient rule adopted pursuant to Section 313.220.

### IV.

■ The plaintiff suggests that the multi-state agreement is an interstate compact which is ineffective because it has not been approved by the legislatures of the participating states, or at least by our legislature, and by the Congress of the United States, as required by Article I, Section 10, Clause 3 of the Constitution of the United States. He also suggests that there is a violation because the commission, rather than the state, is a party to the agreement.

Decisions of the Supreme Court of the United States make it clear, however, that not every agreement among states, or among agencies of different states, is an interstate compact requiring congressional approval. The Supreme Court has held, for example, that states may agree to establish an interstate administrative commission which facilitates the collection of taxes without the approval of congress. *United States Steel Corp. v. Multi–State Tax Commission*, 434 U.S. 452, 468, 98 S.Ct. 799, 810, 54 L.Ed.2d 682 (1978). The purpose of the federal constitutional provision is to protect the federal government against threats to its sovereignty by reason of combinations of states. *See United States Steel Corp. v. Multi–State Tax Commission, supra, Cuyler v. Adams*, 449 U.S. 433, 440, 101 S.Ct. 703, 707, 66 L.Ed.2d 641 (1981). The agreement here involved certainly does not threaten national sovereignty. It exists, rather, to foster a gambling enterprise designed to benefit the treasuries of participating states. There is no threat to federal authority. Congress retains its power to regulate lotteries to the full extent of its delegated powers.

Plaintiff finally contends that the multi-state lottery necessarily violates provisions of the several federal statutes governing the interstate transportation or mailing of lottery tickets, and is not within the exceptions recently enacted to accommodate the current rash of state lotteries. *See* 18 U.S. C. §§ 1301, 1307(b); 18 U.S.C. § 1953. It is not our function to police compliance with these statutes. We cannot limit the constitutional and statutory authority of the commission on the basis of our own conceptions of public policy.

None of the challenges to the authority of the commission is established. The judgment is affirmed.

BILLINGS, C.J., and ROBERTSON, RENDLEN and HIGGINS, JJ., concur.

DONNELLY, J., dissents in separate opinion filed.

WELLIVER, J., dissents in separate opinion filed and concurs in separate dissenting opinion of DONNELLY, J.

DONNELLY, Judge, dissenting.

In 1984 the people of Missouri adopted article III, section 39(b), an amendment to the Constitution which conferred on the General Assembly the "authority to authorize a Missouri state lottery." *Id.* This was done.. §§ 313.200–.350, RSMo 1986 (State Lottery Law). Today, the majority judicially amends the State Lottery Law and it becomes the *Multi*-State Lottery Law. I cannot concur.

First, the purpose of the law, the majority poses, is to "facilitate the institution of the lottery to the full extent authorized by the voters." I disagree. The legislature is not bound to pass laws extending the full breadth of constitutional authorization. *Cf. Perkins v. Benquet Consolidated Mining Co.*, 342 U.S. 437, 440–41, 72 S.Ct. 413, 415–16, 96 L.Ed. 485 (1952) (legislature may in its discretion choose not to extend personal jurisdiction to limits of federal due process). In my view, the language used in the State Lottery Law is dispositive. Only a lottery conducted by and confined to Missouri is suggested.[1] "Where the language of a statute is plain and admits of but one meaning, there is no room for construction." *State ex rel. Missouri State Board of Registration for the Healing Arts v. Southworth*, 704 S.W.2d 219, 224 (Mo. banc 1986). I find no references to a "multi-state lottery" or "multi-state operated lottery" in the State Lottery Law.[2] By like token I find no lack of clarity in the State Lottery Law.

The General Assembly simply has not acted. Confronted with legislative inaction, the majority presumes to amend the State Lottery Law through broad constitutional interpretion, a leap we are not free to make.[3]

Second, I find section 313.220, RSMo 1986, as the majority construes it, an unconstitutional delegation of legislative power to an executive agency, raising "problems of separation of power." *See Menorah Medical Center v. Health & Education Facilities Authority*, 584 S.W.2d 73, 88–91 (Mo. banc 1979) (Donnelly, J., dissenting). Section 313.220 appoints the Commission to "promulgate such rules and regulations governing the establishment and operation of a state lottery as it deemed necessary to fully implement the mandate of the people expressed in the approval of the lottery amendment."

The majority writes "[w]e sense no purpose in the enabling legislation of limiting the commission's authority to approve and institute any lottery game", except those limitations specifically enumerated in sec-

---

1. *See, e.g.,* § 313.220 (commission empowered to establish rules and regulations reference operation and establishment of "a state lottery"); § 313.235 (director of commission to be qualified to direct operations of "a state-operated lottery"); § 313.315 (state auditor to conduct biennial audit of accounts and transactions of "the state lottery"); § 313.321 (directing division of proceeds from sale of "Missouri state lottery tickets"); § 313.335 (statute regulating advertising of a "Missouri state lottery").

2. That "[n]othing in the language of the governing statutes inhibits participation in a multi-state lottery" proves nothing. "An implication must be fair and clear to become part of a statute." *Smith v. Pettis County,* 345 Mo. 839

(1940), 136 S.W.2d 282. Further, the majority draws implied legislative approval from a lack of legislative prohibition, yet finds of no moment that proposals which would have authorized multi-state participation failed legislative approval. The implications to be drawn from these observations should be accorded equal weight; both evince legislative nonaction.

3. Were this the position taken by the Court, of course, there would be no need to pass on the constitutionality of participating in a multi-state lottery game. Our decision "should be limited to those questions *essential* to a proper disposition" of the case. *State ex rel. Ellsworth Freight Lines, Inc. v. State Tax Comm'n,* 651 S.W.2d 130, 133 (Mo. banc 1983) (emphasis added).

tion 313.230(1)(a).[4] It further observes that "the joint committee [on gaming activites] is without power to forbid the commission to institute any lottery game permitted by the constitution and statutes."

Article III, section 39(b) states the *"general assembly* shall have authority to authorize a Missouri state lottery." *Id.* (emphasis added). The principal opinion detaches the lottery commission from legislative supervision, so long as its actions are "authorized by the constitution and statutes."

When the lottery commissioners became "vexed because Missourians * * * continued to venture large sums" in more attractive lotteries in sister states, the State Lottery Law directed what steps they were empowered to take:

The commission *shall:*

* * * * * * *

(5) Report to the governor and general assembly any matters which shall require immediate changes in the laws of this state in order * * * to rectify undesirable conditions in connection with the * * * operation of the lottery;

* * * * * * *

§ 313.230(5), RSMo 1986 (emphasis added). The principal opinion amends this section to read "[t]he commission *may* * * *." In my view, once the matter has been reported, the statutes do not authorize further commission action; I find nothing permitting the commission to "proceed[ ] on [its] own initiative." The power of the commission to act ends pending corrective legislation.

The majority indicates that section 313.-220 confers upon the commission broad discretionary power to expand the geographic scope of lottery participation, and, by implication, that this authority is ongoing. On the other hand, the majority finds the following requirement in that section to refer only to "rules * * * necessary to get the lottery started * * *." "No rule or portion of a rule promulgated under this authority shall become effective until it has been approved by the joint committee on administrative rules." *Id.* This is a curious interpretation. I find no hint that this is indicated in sections 313.220 and .230. The language is plain enough.

Whether to participate in a multi-state lottery is a policy matter. And, in different context:

Formulation of policy is a legislature's primary responsibility, entrusted to it by the electorate, and to the extent Congress delegates authority under indefinite standards, this policy-making function is passed on to other agencies, often not answerable or responsible in the same degree to the people.

*Menorah Medical Center v. Health & Education Facilities Authority,* 584 S.W.2d at 89 (quoting *United States v. Robel,* 389 U.S. 258, 276, 88 S.Ct. 419, 430, 19 L.Ed.2d 508 (1967)) (Brennan, J., concurring in result). In my view, the majority injects indefinite standards in construing the State Lottery Law, and thereby grants unintended breadth of authority to the lottery commission.

In sum, the principal opinion is fundamentally flawed because it treats article III, section 39(b) as a declaration of general public policy in Missouri when it is a mere exception.[5] The general public policy in Missouri is against lotteries: "The general assembly shall not have power * * * [t]o authorize lotteries * * * for any purpose * * *." Mo. Const. art. III, § 39(9).

I must respectfully dissent.

---

**4.** The majority ignores the fact that we deal here not merely with the price of tickets, § 313.230(1)(b), RSMo 1986; the manner of selecting the winning ticket, *id.* § 313.230(1)(d), or methods of selling tickets, *id.,* § 313.230(1)(h). Involved here is an important issue of state policy, of state revenues, and of commitment to an interstate venture. These are matters uniquely within the domain of the legislature.

**5.** As a result, the principal opinion is replete with inconsistency. An egregious example: On the one hand, it states that the 1984 amendment is "not self enforcing." On the other, it declares that this Court "should impose only such restrictions [on lotteries] as are clearly required by the statute."

WELLIVER, Judge, dissenting.

I respectfully dissent. I cannot join in the linguistic legal gymnastics which result in holding that the "plain meaning," 742 S.W.2d at 173, of the words "a Missouri state lottery" is "a Missouri state lottery and/or a multi-state lottery."

The principal opinion reaches this result by ignoring the only word used by the people to give meaning to the words "Missouri state lottery," that is the word "a". Mo. Const. art. III, § 39(b)[1] states that there is excepted from the general prohibition against lotteries authority for the legislature to establish "a Missouri state lottery." Instead of saying "a Missouri state lottery," they could have said "lotteries," or "Missouri State lotteries," or any number of other words having a broader meaning.

I do not believe that the drafters of the lottery amendment chose the words which they used in a vacuum. I believe they were aware that some states authorized multi-state lotteries while some did not. True, the words used by other states do not bind us, but the prior existence of such words should be given some consideration in determining the meaning of the words selected to be used by the drafters of our amendment.

It is true that the unpassed attempted legislative enactments of 1987 have no binding effect on us, but where this constitutional amendment specifically authorized the legislature to establish "a Missouri state lottery" the actions of the legislature on the subject, both positive and negative, are matters to be given some degree of consideration by the court.

I am unable to perceive the wisdom of refusing to follow the long accepted rule of construction that exceptions to general prohibitions must be strictly construed. *Tichenor,* 742 S.W.2d 173. "[E]xceptions to general constitution provisions must be narrowly and strictly construed." 16 C.J.S. *Constitutional Law* § 18 (1984) (footnote omitted); *accord* Antieau, Adjudicating

Constitutional Issues 52 (1985).

We previously noted the history of lotteries in *Barnes v. Bailey,* 706 S.W.2d 25, 30–31 (Mo. banc 1986).

During the late eighteenth and early nineteenth centuries, lotteries were commonplace. "Lotteries, from which the state treasury often took a cut, were commonly authorized by state legislatures to support 'private' institutions. Benjamin Franklin," for example, "once printed eight thousand tickets for a lottery authorized by New Jersey to benefit Princeton.": D. Boorstin, The Americans: The National Experience 161 (1965). Governments often relied upon lotteries "to raise money for new courthouses, internal improvements, and the like." L. Friedman, A History of American Law 586 (2nd Ed.1985). *See also* M. Keller, Affairs of State 509 (1977). It might be noted that an important United States Supreme Court case involved a congressional authorization for a lottery to raise revenue for Washington, D.C. *Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 5 L.Ed. 257 (1821).

Widespread evangelicism, however, led states to embark upon what became a national outcry against lotteries. Lotteries and gift enterprises became regarded as a *particular form* of gambling that merited special prohibition. By the turn of the century, almost all of the states and Congress had anti-lottery laws. L. Friedman, *supra,* at 586; M. Keller, *supra,* at 509–10, 233. Many states, such as Alabama, Arkansas, Georgia, Louisiana, Michigan, Mississippi and Missouri, included the prohibition directly in their state constitution. When discussing the constitutionality of such anti-lottery laws, the United States Supreme Court observed:

> If lotteries are to be tolerated at all, it is no doubt better that they should be regulated by law, so that the people may be protected as far as possible

---

1. *Tichenor v. Missouri State Lottery Comm'n,* 742 S.W.2d 170, 173 (Mo. banc 1988).

against the inherent vices of the system; but that they are demoralizing in their effects, no matter how carefully regulated, cannot admit of a doubt. When the government is untrammelled by any claim of vested rights or chartered privileges, no one has ever supposed that lotteries could not lawfully be suppressed, and those who manage them punished severely as violators of the rules of social morality. From 1822 to 1867, without any constitutional requirements, they were prohibited by law in Mississippi, and those who conducted them [punished] as a kind of gamblers. During the provisional government of that State, in 1867, at the close of the late civil war, the present act of incorporation, with more of like character was passed. The next year, 1868, the people, in adopting a new constitution with a view to the resumption of their political rights as one of the United States, provided that "the legislature shall never authorize any lottery, nor shall the sale of lottery-tickets be allowed, nor shall any lottery heretofore authorized be permitted to be drawn, or tickets therein to be sold.": Art. 12, sect. 15. There is now scarcely a State in the Union where lotteries are tolerated ...

*Stone v. Mississippi*, 101 U.S. [11 Otto] 814, 818–19, 25 L.Ed. 1079 (1879). In *Stone*, and earlier in *Boyd v. Alabama,* 94 U.S. [4 Otto] 645, 24 L.Ed. 302 (1876), the Supreme Court upheld antilottery laws against constitutional challenges. *See also Douglas v. Kentucky*, 168 U.S. 488, 18 S.Ct. 199, 42 L.Ed. 553 (1897); *New Orleans v. Houston*, 119 U.S. 265, 7 S.Ct. 198, 30 L.Ed. 411 (1886). And in 1903, the Supreme Court upheld a federal law prohibiting the interstate transport of lottery tickets, often referring to the *evil* of lotteries as "a species of interstate commerce which, although in general use and somewhat favored in both national and state legislation in the early history of the country, has grown into disrepute and has become offensive to the entire people of the Nation." *Champion v. Ames*, 188 U.S. 321, 358, 23 S.Ct. 321, 328, 47 L.Ed. 492 (1903). *See also In Rapier*, 143 U.S. 110, 12 S.Ct. 374, 36 L.Ed. 93 (1892) (lottery matter excluded from the mails). However, other forms of gambling, such as horse-racing, did not capture the public's attention. The Supreme Court offered the explanation that:

> [e]xperience has shown that the common forms of gambling are comparatively innocuous when placed in contrast with the widespread pestilence of lotteries. The former are confined to a few persons and places, but the latter infects the whole community: it enters every dwelling; it reaches every class; it preys upon the hard earnings of the poor; it plunders the ignorant and simple.
>
> *Phalen v. Virginia*, 49 U.S. (8 How.) 163, 168, 12 L.Ed. 1030 (1850).

Since 1836, Missouri prohibited all forms of lotteries. Section 1 Lotteries, RSMo 1835. In 1865, the prohibition against lotteries became part of the Missouri Constitution. In *State ex Inf. McKittrick v. Globe–Democrat Publishing Co.*, 341 Mo. 862, 110 S.W.2d 705, 713 (Mo. banc 1937) (citations omitted), this Court also observed:

> Lotteries are judicially denounced as especially vicious, in comparison with other forms of gambling, because by their very nature they are public and pestilentially infect the whole community. They prey upon the credulity of the unwary and widely arouse and appeal to the gambling instinct.

The constitution still prohibits lotteries in Mo. Const. art. III, § 39(9). The general assembly shall not have the power:

> Except as otherwise provided in section 39(b) or section 39(c) of this article, to authorize lotteries or gift enterprises for any purpose, and shall enact laws to prohibit the sale of lottery or gift enterprise tickets, or tickets in any scheme in the nature of a lottery....

In 1984, the people of the State of Missouri approved a constitutional amendment authorizing a state lottery. The amendment in Section 39(b) provides: "1. The general assembly shall have authority to authorize *a Missouri state lottery.*" (Emphasis added.) The amendment establishes a State Lottery Commission, provides for the distribution of funds from ticket sales, retail sales agents and limits the use of advertising.

At issue in this case is whether the 1984 amendment permitting "a Missouri state lottery" also permits participation in a multistate lottery.

Rules applicable to constitutional construction are the same as those applied to statutory construction, except that the former are given a broader construction, due to their more permanent character. *State at the Information of Martin v. City of Independence,* 518 S.W.2d 63, 65 (Mo.1974). In determining the meaning of a constitutional provision the court must first undertake to ascribe to the words the meaning which the people understood them to have when the provision was adopted. *State at the Information of Danforth v. Cason,* 507 S.W.2d 405, 408 (Mo. banc 1973). The meaning conveyed to the voters is presumptively equated with the ordinary and usual meaning given thereto. *Id.* at 409. The ordinary, usual and commonly understood meaning is, in turn, derived from the dictionary. *Id. Accord, Concerned Parents v. Caruthersville School District,* 548 S.W.2d 554 (Mo. banc 1977); *State ex rel. Curators of the University of Missouri v. Neill,* 397 S.W.2d 666 (Mo. banc 1966); *Rathjen v. Reorganized School District R–II of Shelby County,* 365 Mo. 518, 284 S.W.2d 516 (1955) ... Finally, due regard is given to the primary objectives of the provision in issue as viewed in harmony with all related provisions, considered as a whole. *State at the Information of Martin v. City of Independence,* 518 S.W.2d at 65. By following these rules, the fundamental purpose of constitutional construction is accomplished, to give effect to the intent of the voters who adopted the amendment. *Rathjen v. Reorganized School District R–II of Shelby County, supra. Boone County Court v. State,* 631 S.W.2d 321, 324 (Mo. banc 1982).

"State" is defined in Webster's Third New International Dictionary 2228 (1976) as "a body of people permanently occupying a definite territory and politically organized under a sovereign government almost entirely free from external control and possessing coercive power to maintain order within the community." "Lottery" is defined as "a scheme for the distribution of prizes by lot or chance; *esp:* a scheme by which prizes are distributed to the winners among those persons who have paid for a chance to win them usu. as determined by the numbers on tickets as drawn at random." *Id.* at 1338.

The plain dictionary meaning of the words can lead to no other conclusion than that the plain and ordinary meaning at the time the people voted on the amendment is that "a Missouri state lottery" means a lottery operated within this state.

While I am aware that one hundred fifty years after the states abolished lotteries as a vehicle for taxation, politicians might reinvent the right of the people to periodically repeat the mistakes of the past. I am not prepared to see this Court either abandon strict construction of our constitution or to see it affirmatively participate in making the mistakes of the past.

The trial court should be reversed.