No. 99,957

STATE, *ex rel.* STEPHEN N. SIX, ATTORNEY GENERAL, *Appellant,*
v. KANSAS LOTTERY and ED VAN PETTEN, *Appellees.*
(186 P.3d 183)

558

Opinion filed June 27, 2008.

*Michael C. Leitch,* deputy attorney general, argued the cause, and *Steven W. Allton,* assistant attorney general, was with him on the briefs for the appellant.

*Dan Biles,* of Gates, Biles, Shields & Ryan, P.A., of Overland Park, argued the cause and was on the briefs for the appellees.

*Nathan D. Leadstrom, Wayne T. Stratton,* and *Arthur E. Palmer,* of Goodell, Stratton, Edmonds & Palmer, L.L.P., of Topeka, were on the brief for *amicus curiae* Stand Up for Kansas, Inc.

*David Prager, III,* of Mayetta, and *William P. Tretbar, Lyndon W. Vix, Stephen E. Robinson,* and *Brooks G. Kancel,* of Fleeson Gooing Coulson & Kitch, LLC, of Wichita, were on the brief for *amicus curiae* Prairie Band Potawatomi Nation.

*Michael J. Davis,* of Stinson Morrison Hecker LLP, of Kansas City, Missouri, was on the brief for *amicus curiae* The Woodlands.

*Teresa L. Watson* and *David R. Cooper,* of Fisher, Patterson, Sayler & Smith, L.L.P., of Topeka, were on the brief for *amici curiae* Cherokee County, Kansas, and Sumner County, Kansas.

The opinion of the court was delivered by

ROSEN, J: This case comes before the court on a direct appeal pursuant to K.S.A. 2007 Supp. 60-2102(b)(2). The appellant seeks review of an order of the district court upholding the constitutionality of the Kansas Expanded Lottery Act (KELA), K.S.A. 2007 Supp. 74-8733 *et seq.*

This appeal asks us to resolve tension among the historical ban on lotteries contained in the Kansas Constitution, later amendments to the constitution that permit lotteries under certain circumstances, and recent legislative action seeking to increase state revenues by establishing supervised gambling venues. The issue before this court is narrow: Does the legislative scheme provide for a lottery that is owned and operated by the State of Kansas? An integrated study of the history of lotteries in Kansas, the language of the Kansas Constitution, the interpretation of similar laws in other states, and the legislative provisions contained in KELA leads us to conclude that KELA complies with the constitutional prohibitions and mandates.

## Background

Since the admission of Kansas into the Union in 1861, art. 15, § 3, of the Kansas Constitution has provided: "Lotteries and the sale of lottery tickets are forever prohibited." A series of cases proceeded to define what constitutes a lottery. See, *e.g.*, *State ex rel. v. Mercantile Association*, 45 Kan. 351, 25 Pac. 984 (1891) (distribution of prizes by chance drawing is illegal lottery); *In re Smith, Petitioner*, 54 Kan. 702, 39 Pac. 707 (1895) (constitutional ban on sale of lottery tickets is self-executing); *Davenport v. City of Ottawa*, 54 Kan. 711, 39 Pac. 708 (1895) (purchase of goods entitling entry in chance drawing is illegal lottery); *The State, ex rel. v. Fair Association*, 89 Kan. 238, 131 Pac. 626 (1913) (betting on horse races is gambling); *State, ex rel., v. Fox Kansas Theatre Co.*, 144 Kan. 687, 62 P.2d 929 (1936) (theater bank night is lottery even though no purchase required); *City of Wichita v. Stevens*, 167 Kan. 408, 207 P.2d 386 (1949) (punch boards are form of lottery); *State v. Brown*, 173 Kan. 166, 244 P.2d 1190 (1952) (punch boards constitute illegal lottery); *State, ex rel., v. Bissing*, 178 Kan. 111, 283 P.2d 418 (1955) (parimutuel betting on dog racing is a lottery); *State ex rel. v. Highwood Service, Inc.*, 205 Kan. 821, 473 P.2d 97 (1970) (giveaway radio show involves no consideration; game is not a lottery); *State v. Nelson*, 210 Kan. 439, 502 P.2d 841 (1972) (slot machines are form of lottery).

In the 1974 general election, the State adopted a constitutional amendment permitting games of bingo to be conducted by certain nonprofit organizations. This amendment was later amended to allow instant bingo games. Kan. Const. art. 15, § 3a. On November 1, 1986, the citizens of Kansas voted to amend the Kansas Constitution to permit parimutuel wagering in horse and dog racing and to authorize a "state-owned and operated lottery." Sixty-four percent of Kansas voters approved the lottery amendment. The lottery amendment reads:

"Notwithstanding the provisions of section 3 of article 15 of the constitution of the state of Kansas, the legislature may provide for a state-owned and operated lottery, except that such state-owned lottery shall not be operated after June 30, 1990, unless authorized to be operated after such date by a concurrent resolution approved by a majority of all of the members elected (or appointed) and qualified

of each house and adopted in the 1990 regular session of the legislature. The state shall whenever possible provide the public information on the odds of winning a prize or prizes in a lottery game." Kan. Const. art. 15, § 3c.

Following approval of the 1986 amendments, Kansas enacted legislation allowing horse and dog racing (K.S.A. 74-8801 *et seq.*) and enabling a state-owned and operated lottery (K.S.A. 74-8701 *et seq.*). In 1987, the legislature created the Kansas Racing Commission to supervise parimutuel betting, which in 1996 was renamed the Kansas Racing and Gaming Commission. L. 1987, ch. 112, sec. 3; L. 1996, ch. 256, sec. 18. In 1990, the Kansas Legislature extended the life of the state-owned lottery. L. 1990, ch. 370. The lottery is now scheduled to expire on July 1, 2022. K.S.A. 2007 Supp. 74-8723(a).

Two earlier cases before this court have addressed the interplay between the constitutional ban on lotteries and the subsequent amendments permitting limited lotteries: *State ex rel. Stephan v. Finney*, 254 Kan. 632, 867 P.2d 1034 (1994) (definition of lottery includes gambling enterprises in general); and *State ex rel. Stephan v. Parrish*, 256 Kan. 746, 887 P.2d 127 (1994) ("instant bingo" exceeds constitutional boundaries for legal bingo games). No constitutional challenges under the constitutional lottery provisions have come to this court since *Parrish* was decided in 1994, and this court has never been asked to address the constitutionality of the 1987 Kansas Lottery Act.

During the 2007 legislative session, the Kansas Legislature passed, and the Governor signed, SB 66, "An act concerning lotteries; enacting the Kansas expanded lottery act, authorizing operation of certain gaming facilities, electronic gaming machines and other lottery games at certain locations . . . ." KELA became effective April 19, 2007. L. 2007, ch. 110. It is codified at K.S.A. 2007 Supp. 74-8733 *et seq.* It generally provides for gaming in casinos and parimutuel racetracks in four gaming zones. K.S.A. 2007 Supp. 74-8734(d); K.S.A. 2007 Supp. 74-8737; K.S.A. 2007 Supp. 74-8741(a). The four zones are the northeast Kansas gaming zone, consisting of Wyandotte County; the southeast zone, consisting of Crawford and Cherokee Counties; the south-central zone, consisting of Sedgwick and Sumner Counties; and the south-

west zone, consisting of Ford County. K.S.A. 2007 Supp. 74-8702(f).

On August 23, 2007, the attorney general filed an original action in quo warranto and mandamus with this court under case number 99,128. K.S.A. 2007 Supp. 74-8733(c) expressly provides that "[a]ny action challenging the constitutionality of . . . this act . . . shall be brought in the district court of Shawnee county," and we therefore transferred the case to the Shawnee County District Court. The district court filed a 41-page memorandum decision and order on February 1, 2008, holding that the statute passed constitutional muster. The State of Kansas, through the attorney general, filed a timely notice of appeal and amended notice of appeal.

The attorney general is the proper party to pursue this action. See K.S.A. 2007 Supp. 75-702; *Rowlands v. State*, 187 Kan.174, Syl., 354 P.2d 674 (1960) (action questioning authority of governmental agencies should be brought in name of the State on the relation of the attorney general or county attorney); see also *State ex rel. Stephan v. Parrish*, 257 Kan. 294, 891 P.2d 445 (1995) (mandamus is proper remedy to obtain authoritative interpretation of law for guidance of public officials); *Parrish*, 256 Kan. 746 (attorney general challenged constitutionality of instant bingo statute); *Finney*, 254 Kan. 632 (attorney general brought action to determine Governor's authority to negotiate tribal casino compacts; action brought pursuant to Senate resolution).

We will not address arguments raised or advanced solely by nonparty *amici curiae*. These include policy concerns regarding the wisdom of raising revenues by means of a lottery and arguments about the validity of an election authorizing a gaming facility in Sumner County. A party must file a notice of appeal or cross-appeal in order to raise an issue for appellate review, see *Mid-Continent Specialists, Inc. v. Capital Homes*, 279 Kan. 178, 191-92, 106 P.3d 483 (2005), and the *amici* do not have standing to file appeals. We will not consider issues argued by nonparties when those issues are beyond the ones raised by the parties. See *Jones v. Bordman*, 243 Kan. 444, 450-51, 759 P.2d 953 (1988).

*Standard of Review*

The constitutionality of a statute is a question of law, and this court applies a de novo standard of review to the judgment of the district court. *Tolen v. State*, 285 Kan. 672, 673, 176 P.3d 170 (2008).

In *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 883-84, 179 P.3d 366 (2008), we stated the appropriate standard for reviewing the constitutionality of a statute:

"[T]he separation of powers doctrine requires a court to presume a statute to be constitutional. [Citation omitted.] 'A statute is presumed constitutional and all doubts must be resolved in favor of its validity. If there is any reasonable way to construe a statute as constitutionally valid, the court must do so.' [Citation omitted.]"

It is not the duty of this court to criticize the legislature or to substitute its view on economic or social policy; it is the duty of this court to safeguard the constitution. *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, 348, 789 P.2d 541 (1990).

In *Parrish*, 256 Kan. 746, this court also reviewed the constitutionality of a statute in light of the lottery provisions in the Kansas Constitution. In construing art. 15, § 3a—the bingo exception to the prohibition on lotteries—the court applied similar rules of construction.

The *Parrish* court explained that it is our duty to uphold a statute under attack rather than to defeat it. Before striking down a statute, the court must find that the statute clearly violates the constitution. This court will not strike down a legislative enactment on the mere ground that it fails to conform with a strictly legalistic definition or a technically correct interpretation of constitutional provisions. Instead, the test is whether the legislation conforms with the " 'common understanding of the masses' " at the time they adopted the constitutional provisions, and the presumption favors the natural and popular meaning in which the words were understood by the adopters. 256 Kan. at 750 (quoting *State ex rel. Schneider v. Kennedy*, 225 Kan. 13, 20-21, 587 P.2d 844 [1978]).

This court will construe § 3c in the same broad way that we would construe § 3. "In ascertaining the meaning of a constitutional

provision, the primary duty of the courts is to look to the intention of the makers and adopters of that provision." *Finney*, 254 Kan. at 654. The framers of § 3 " 'conscientiously determined that prohibiting lotteries forever was *a method of promoting a sound basis for the welfare and growth of this state.*' " (Emphasis added.) *Parrish*, 256 Kan. at 755 (quoting *Nelson*, 210 Kan. at 444).

The legislative record contains little evidence of what the Kansas legislators and voters thought or intended when approving art. 15, § 3c. *Finney*, 254 Kan. at 847. It appears, however, that the voters intended "to allow closely regulated gambling and to raise money for the state." 254 Kan. at 847 (quoting Att'y Gen. Op. No. 87-16, citing Minutes of the House Federal and State Affairs Committee, January 21, 1986, testimony of Secretary of Revenue Harley Duncan).

The intention underlying both § 3 and § 3c of article 15 involves promoting the economic welfare and growth of this state. This unity of intention compels us to read § 3c to favor the constitutionality of legislation purporting to create a state-owned lottery, as we have read § 3 to foreclose gambling schemes in the past.

The Missouri Supreme Court followed this reasoning in *Tichenor v. Missouri State Lottery Commission*, 742 S.W.2d 170, 173 (1988):

"The plaintiff-appellant argues that the constitutional authorization should be construed strictly because it represents an exception to the historic Missouri policy against lotteries and gambling enterprises of all kinds. The defendant officials contend, contrariwise, that the voters of the state showed that they wanted a lottery and that the constitutional authorization should be liberally construed to give effect to this authorization. We suggest that the words should be read in accordance with their plain meaning, so as to carry out the purpose manifested by the voters of the state in approving the amendment referred to them by the general assembly. By reason of the amendment, a lottery in which all the profits inure to the benefit of the state of Missouri accords with the public policy of the state, rather than contravening it."

The intended purpose of KELA conforms with the intended purpose of § 3c of article 15, and we will therefore read the statute with a presumption that it meets the constitutional requirements.

### Ownership and Operation

What does the phrase "state-owned and operated lottery" mean in the context of our state constitution? The petitioner advocates

a narrow meaning: the State must own the facility where the lottery is played or where game tickets are dispensed, must own the gaming equipment, must hire workers at the facilities and issue their paychecks, and must make both large and small management decisions. In other words, the State must hold the title to the principle tangible property associated with the lottery, and the principle decision-makers must be state employees. The respondent, on the other hand, argues for an expansive meaning: It suffices that the State have an ownership interest in the enterprise and that it actively supervise the management of the enterprise. Further, for constitutional purposes, the State may own an intangible interest and may direct the control of the activities of nonstate employees.

Neither § 3c nor the explanatory notes presented to the electorate contained definitions of "owning," "operating," or "lotteries." "From all the testimony for and against the proposed amendment to allow a state-owned lottery . . . [t]here is no indication that during the hearings and debate the legislature intended to define what constituted a 'state-owned lottery' or attempted to limit what types of gambling the State could constitutionally own and operate." *Finney*, 254 Kan. at 651-52. Because the constitutional provision is not self-defining, the courts must function as the definers of the words of the constitution. *Finney*, 254 Kan. at 652-53; see also *Parrish*, 256 Kan. at 755 (court has authority and duty to define constitutional provisions).

The parties disagree on exactly what the State must own and operate. This court has previously defined the subject matter as follows:

"A state-owned lottery, as that term is used in art. 15, § 3c of the Kansas Constitution, means any state-owned and operated *game, scheme, gift, enterprise, or similar contrivance* wherein a person agrees to give valuable consideration for the chance to win a prize or prizes." (Emphasis added.) *Finney*, 254 Kan. at 656.

It is unnecessary that the State own the physical plant associated with the lottery. It suffices that the State own the game, or the scheme, or the enterprise. Such a definition is consistent with a standard of review favoring the constitutionality of KELA.

The words "own" and "ownership" are not technical terms or terms of art but common terms, the precise legal meaning of which

depends upon the context in which they appear. See *Dole Food Co. v. Patrickson*, 538 U.S. 468, 481, 155 L. Ed. 2d 643, 123 S. Ct. 1655 (2003) (Breyer, J., concurring in part and dissenting in part). In addition to citing cases in which the Supreme Court had applied the concept of corporate ownership in an expansive manner, Justice Breyer quoted J. Cribbet & C. Johnson, Principles of the Law of Property 16 (3d ed. 1989)—" 'Anglo-American law has not made much use of the term ownership in a technical sense,' " and Black's Law Dictionary 1049, 1105 (6th ed. 1990)—" 'The term ["owner"] is . . . a nomen generalissimum' "—a "term of the most general meaning" or "of the most general kind"—"and its meaning is to be gathered from the connection in which it is used, and from the subject-matter to which it is applied." 538 U.S. at 481-82; see also *The State v. Toliver*, 109 Kan. 660, 665, 202 Pac. 99 (1921) ("owner" is a "flexible term").

Ownership is "[t]he bundle of rights allowing one to use, manage, and enjoy property, including the right to convey it to others." Black's Law Dictionary 1138 (8th ed. 2004). "An owner may have complete property in the thing or may have parted with some interests in it (as by granting an easement or making a lease)." Black's Law Dictionary 1137 (8th ed. 2004).

Although ownership may exist without operation and operation may exist without ownership, the two concepts are closely intertwined. Wide-ranging operational discretion implies ownership, and ownership implies discretion in making operating decisions.

This court has previously taken an expansive meaning of the word "ownership" in the context of businesses and enterprises. See *State v. Barclay*, 238 Kan. 148, 152, 708 P.2d 972 (1985) (ownership of wedding chapel business does not imply that the owner is ordained to perform ceremonies or that the owner has exclusive use of premises or makes arrangements for the wedding); see also *Rodriquez v. John Russell Constr.*, 16 Kan. App. 2d 269, 274-75, 826 P.2d 515 (1991) (business of municipal corporation, when involved with local housing authority, becomes "everything inherent to the ownership and operation of an apartment complex").

Ownership does not necessarily mean absolute dominion over the subject property. *Marsh v. Alabama*, 326 U.S. 501, 506, 90 L.

Ed. 265, 66 S. Ct. 276 (1946). Operation likewise does not imply absolute control, especially in the business context. Control of a corporation need not mean control of business minutiae; the owner can be " 'enmeshed in the direction and control of the business without being involved in the actual management.' " *Trudgeon v. Fantasy Springs Casino*, 71 Cal. App. 4th 632, 641, 84 Cal. Rptr. 65 (1999) (quoting *Gavle v. Little Six, Inc.*, 555 N.W.2d 284, 295 [Minn. 1996]).

In *Lario Enterprises, Inc. v. State Bd. of Tax Appeals*, 22 Kan. App. 2d 857, 925 P.2d 440, *rev. denied* 261 Kan. 1085 (1996), our Court of Appeals discussed whether a race and motor sports facility (HPT) was owned and operated by the City of Topeka. Under the terms of a development and management agreement, a private enterprise, Lario Enterprises, contracted to obtain title to the real estate for the planned race track and to deed that land to the city for a term of 23 years. The city contended that HPT belonged to the city and was therefore tax-exempt, while U.S.D. 450, Shawnee Heights, contended that HPT was a private concern and subject to taxation. The Court of Appeals held: "The fact that the city has opted to operate HPT through a management agreement with Lario does not mean the City does not operate HPT." 22 Kan. App. 2d at 864.

The Court of Appeals relied in part on *Bailey v. City of Topeka*, 97 Kan. 327, 154 Pac. 1014 (1916). In *Bailey*, our court considered a public park donated to the city with the provision that " 'said real estate shall be inalienable by said city of Topeka, either by way of deed, conveyance, lease, or in any other manner, and shall be forever held and used for [the benefit of the citizens of Topeka].' " 97 Kan. at 328. A challenge was brought because the city granted certain individuals exclusive rights within the park to operate refreshment and lunch stands and to provide boats and bathing facilities for a profit. Our court rejected the contention that the city had improperly alienated its exclusive interest in the park land by allowing private individuals to provide public services for a profit. The court reasoned:

"The city might through its employees furnish these conveniences directly, collecting reasonable charges therefor. The fact that a profit resulted would not

render the transaction objectionable. The incidental revenue would not characterize the transaction as commercial rather than governmental. Substantially the same result is accomplished by authorizing certain individuals to attend to the business of supplying the wants of the public with respect to the matter referred to, retaining so much of the proceeds as will fairly compensate them for their services and investment, and turning the residue over to the city." 97 Kan. at 329.

Our court reached a similar conclusion in *Gage v. City of Topeka*, 205 Kan. 143, 468 P.2d 232 (1970), rejecting a claim that granting a private individual an exclusive right to operate a miniature train in a public park constituted an alienation of public ownership of the park. The essence of *Bailey, Gage*, and *Lario Enterprises* is that a public entity may retain both ownership and operation of an enterprise—in those cases, a public park and a racing facility—while allowing private entities to profit from the ownership of businesses that promoted the social benefit of the public enterprise. These cases demonstrate that ownership of a business enterprise does not require legal title or exclusivity of ownership interests. They also demonstrate that operation is a fluid concept that may be manifested through supervision, subcontracting, or leasing.

## Analysis Of The Issue In Other Jurisdictions

The parties urge this court to consider the outcomes in other jurisdictions to constitutional challenges to gaming operations. Those cases have limited application to the issue before us, because the language of the Kansas Constitution and the intention of its adopters require unique construction. See *Nelson*, 210 Kan. at 444. We nevertheless find it instructive to review cases from several other jurisdictions.

In *State v. West Virginia Economic Dev. Auth.*, 214 W. Va. 277, 287, 588 S.E.2d 655 (2003), the West Virginia Supreme Court of Appeals considered a video lottery act in light of a constitutional provision that allows the legislature to " 'authorize *lotteries which are regulated, controlled, owned and operated* by the State of West Virginia in the manner provided by general law, either separately by this State or jointly or in cooperation with one or more states[.]' " (Emphasis added.) The purpose of the act "was to establish a single

state owned and regulated video lottery thus allowing the State to collect revenue therefrom, control the operations of the machines, and stem the proliferation of gambling in the State. [Citation omitted.]" 214 W. Va. at 289. The act allowed video lottery games to be placed in licensed private establishments. 214 W. Va. at 289.

Opponents of the act argued that the video lottery was not sufficiently regulated, controlled, owned, and operated by the state. They contended that "the video lottery machines are operated, controlled and owned by their private manufacturers, operators, and retailers." 214 W. Va. at 291. In finding the statute constitutional, the court pointed to numerous indicia of state regulation, control, ownership, and operation. These included mandatory approval of the lottery terminals at licensed racetracks by the Lottery Commission, a central monitoring system that could immediately disable the games, mandatory licensing qualifications, and ownership by the Lottery Commission of the main logic boards and all erasable programmable read-only memory chips. 214 W. Va. at 292.

In *Dalton v. Pataki*, 5 N.Y.3d 243, 270, 802 N.Y.S.2d 72, 835 N.E.2d 1180, *cert. denied* 546 U.S.1032 (2005), the New York Court of Appeals considered a constitutional provision generally prohibiting lotteries but making an exception for lotteries "operated by the state." The court found that participation in a multistate lottery did not violate the state constitution, because New York retained sufficient control over the sale of lottery tickets so as to operate the lottery within the state. New York retained the authority to specify where and in what manner the lottery tickets might be sold, the power to license ticket agents and determine their compensation, and the freedom to withdraw from the multistate agreement. 5 N.Y.3d at 271. Although the state regularly contracted with outside vendors and other entities for equipment and services, operation remained under the control of the state. "While the State may not have exclusive control over every aspect of the Mega Millions lottery, it operates the multistate lottery within New York as required by the Constitution [citation omitted]." 5 N.Y.3d at 271.

A similar question was presented in South Dakota, where the central issue involved discrimination against out-of-state business interests. Article III, § 25 of the South Dakota Constitution provides:

"The legislature shall not authorize any game of . . . lottery . . . . However, it shall be lawful for the legislature to authorize by law, a state lottery or video games of chance, or both, which are regulated by the state of South Dakota, either separately by the state or jointly with one or more states, and which are *owned and operated* by the state of South Dakota, either separately by the state or jointly with one or more state or persons." (Emphasis added.)

South Dakota participates in a video lottery business called the South Dakota Lottery. South Dakota does not own the video machines on which the games of chance are played or the modems attached to the machines, but the state owns the dominant software programs that operate the machines. The state bills the owners/operators of the machines for its portion of the revenue. *Chance Management, Inc. v. State of S.D.*, 97 F.3d 1107, 1109 (8th Cir. 1996). The Eighth Circuit concluded that this arrangement constituted a "state business" within the gaming market and that South Dakota "owns and operates" the gaming enterprise. 97 F.3d at 1109, 1111; see also *State, ex rel. Ohio Roundtable v. Taft*, 2003 WL 21470307 (Ohio App. 2003) (unpublished opinion) (delegation of certain operational and promotional functions did not violate constitutional provision permitting only "agency of the state" to conduct lottery); *Tichenor v. Missouri State Lottery Commission*, 742 S.W.2d 170 (participation in multi-state lottery consistent with state constitution authorizing Missouri state lottery); *cf. In re Advisory Opinion to Governor*, 856 A.2d 320 (R.I. 2004) (*Casino I*); *In re Advisory Opinion* (*Casino II*), 885 A.2d 698 (R.I. 2005) (insufficient control over selection of games and managers, lack of a centralized computer authority, and insufficient control over flow of income, allocation of prizes, and extension of credit to patrons would result in violation of constitutional requirement that state have power to make decisions about all aspects of casino function).

These cases from our sister jurisdictions demonstrate that sufficient indicia of state ownership and operation may lie in diverse areas such as ownership of gaming software, centralized monitoring

and control of electronic games, retention of the authority to approve or veto individual games, control of how and where lottery games are played, and the flow of gaming revenues directly to and from the State.

### KELA and the Indicia of Ownership and Operation

Our analysis of the concepts of ownership and operation, in concert with the approaches that our sister states have taken to lottery ownership and operation, leads us to the conclusion that the constitution does not mandate physical ownership of the gaming plant or immediate control of all aspects of gaming operations. We instead will look at the statute to determine whether it establishes sufficient indicia of ownership and operation to comply with the constitutional requirements.

KELA explicitly places "full, complete and ultimate ownership and operational control of the gaming operation of the lottery gaming facility with the Kansas lottery." K.S.A. 2007 Supp. 74-8734(h)(17). It also provides that the lottery "shall retain full control over all decisions concerning lottery gaming facility games." K.S.A. 2007 Supp. 74-8734(h)(17). In addition, the statute provides the Kansas lottery with the authority to overrule without prior notice any action by a lottery gaming facility manager. K.S.A. 2007 Supp. 74-8734(h)(17).

The statutory scheme, when read in its entirety, shows that these direct statements of ownership and operational control are not mere verbal camouflage. KELA mandates that the Kansas lottery shall be the licensee and owner of all the software programs used at the lottery gaming facilities for all lottery games. K.S.A. 2007 Supp. 74-8734(n)(1). The games themselves are to be leased or purchased for the Kansas lottery. K.S.A. 2007 Supp. 74-8734(n)(2). Electronic gaming machines will be directly linked to a central lottery communications system to provide monitoring, auditing, and other available program information to the Kansas lottery and will be online and in constant communication with a central computer. K.S.A. 2007 Supp. 74-8749(a)(2), (3). These machines will be subject to deactivation at any time by order of the executive director. K.S.A. 2007 Supp. 74-8749(a)(4). These provisions place

ownership and control of key lottery elements squarely in the hands of the Kansas lottery.

The games themselves will all be purchased or leased for the Kansas lottery, and the games will be subject to the ultimate control of the Kansas lottery. K.S.A. 2007 Supp. 74-8734(n)(2). The Kansas lottery must approve each specific type of electronic gaming machine and lottery facility game. K.S.A. 2007 Supp. 74-8750(a). The Executive Director of the Racing and Gaming Commission must issue a certificate approving the use of any electronic gaming machine or lottery facility game before the machine or game may be operated. K.S.A. 2007 Supp. 74-8750(b).

The flow of the monetary proceeds into and out of the gaming facilities—another key indicium of ownership and operation—also resides directly with the Kansas lottery. All lottery gaming-facility revenues from lottery gaming facilities and all net electronic gaming machine income from racetrack gaming facilities will be paid daily and electronically to the executive director of the racing and gaming commission. K.S.A. 2007 Supp. 74-8766(b). The executive director certifies weekly the percentages or amounts to be transferred from each account maintained in the expanded lottery receipts fund to the expanded lottery act revenues fund, the live horse racing supplement fund, the live greyhound racing purse supplement fund, and the problem gambling and addictions grant fund. K.S.A. 2007 Supp. 74-8766(c). On a monthly basis, the executive director then distributes amounts from each account to be paid to cities, counties, and lottery gaming facility managers and racetrack gaming facility managers. K.S.A. 2007 Supp. 74-8766(c). The income flows to the State of Kansas, and the proceeds are distributed by the State of Kansas.

Although KELA allows the Kansas lottery to contract for the management of gaming facilities, any management contract must include provisions for the Kansas Racing and Gaming Commission to oversee all lottery gaming facility operations, including internal controls; security facilities; performance of background investigations; determination of qualifications and credentials of employees, contractors, and agents of the managers; auditing of facility revenues; enforcement of all state laws; and maintaining the integrity

of gaming operations. K.S.A. 2007 Supp. 74-8734(h). The State may enter into these contracts to manage or to construct and manage gaming facilities on behalf of the State and subject to the operational control of the State. K.S.A. 2007 Supp. 74-8734(d).

While the state is not the exclusive owner and operator of all aspects of the lottery enterprise under KELA, the State owns and operates the enterprise itself and owns and operates key elements of the lottery. The payment of gaming revenues directly to the State, the ownership by the state of software licenses, the central monitoring of electronic games, and the authority to enter into management contracts and to supervise the managers constitute substantial indicia of ownership by the State and concomitant operation.

### Delegation of Powers

As an ancillary issue, the attorney general asks that this court find an improper delegation of power by the legislature to the casino managers. This argument posits that the State has surrendered so much operational discretion to private managers that those managers will exercise legislative functions, which are constitutionally reserved to the legislature.

While the legislature possesses the legislative power of the State, it is generally impracticable for the legislature to exercise the power in detail. *Blue Cross & Blue Shield of Kansas, Inc. v. Praeger*, 276 Kan. 232, 277, 75 P.3d 226 (2003). The legislature may enact general provisions and leave to those who are to act under those provisions the discretion to fill in the details. 276 Kan. at 277-78, 280-81. The legislature may transfer broad powers to executive or other agencies to set guidelines and to fashion remedies. See 276 Kan. at 280.

The extensive terms of KELA detailing the purpose, authority, and restrictions on the Racing and Gaming Commission belie any improper delegation of authority.

### Conclusion

Ownership and operation are flexible concepts. This court will read a constitutional provision so as to carry out the intention of

the citizens when they enacted the provision, and the court will read a statute with a presumption of constitutionality. The legislature and citizens amended the constitution in order to provide a mechanism for raising revenues for the State and for promoting economic growth, goals that KELA is structured to accomplish. KELA, while not providing for total and unambiguous ownership and operation by the State, contains sufficient indices of ownership and control for it to comply with the constitutional mandate.

The decision of the district court is affirmed.