No. 71,105

STATE OF KANSAS, *ex rel.* ROBERT T. STEPHAN, Attorney General, *Appellant,* v. NANCY PARRISH, Secretary, Kansas Department of Revenue, *Appellee,* and Topeka Lodge No. 555, Loyal Order of Moose, *Intervenor/Appellee.*

(887 P.2d 127)

Opinion filed December 22, 1994.

*John W. Campbell,* deputy attorney general, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the brief for appellant.

*Ronald R. Hein,* of Hein, Ebert and Weir, Chtd., of Topeka, argued the cause, and *Stephen P. Weir,* of the same firm, was with him on the brief for intervenor/appellee Topeka Lodge No. 555, Loyal Order of Moose.

*David J. Brown,* of Lawrence, argued the cause, and *Charles A. Briscoe,* of Topeka, was with him on the brief for appellee Nancy Parrish, Secretary of Department of Revenue.

The opinion of the court was delivered by

HOLMES, C.J.: This is an action in mandamus and quo warranto filed by the State of Kansas on the relation of Robert T. Stephan, Attorney General (the State), against Nancy Parrish in her capacity as Secretary of the Kansas Department of Revenue (the Secretary). The State asserted that certain provisions of K.S.A. 79-4701 *et seq.,* creating "instant bingo," were unconstitutional. The Topeka Lodge No. 555, Loyal Order of Moose (Intervenor) was allowed to intervene in the proceedings pursuant to K.S.A. 60-224(a)(2) and (b). The State now appeals from the ruling of the district court that the "instant bingo" provisions of K.S.A. 79-4701 *et seq.* are constitutionally permissible.

The background and procedure leading to this appeal will be set forth in some detail for a proper understanding of the issue before this court.

Since the admission of Kansas into the Union in 1861, Art. 15, §. 3 of the Kansas Constitution has provided: "Lotteries and the sale of lottery tickets are forever prohibited." In 1971, the state legislature attempted to circumvent the anti-lottery provision with the enactment of K.S.A. 1971 Supp. 21-4302. Subsection (1)(d) of the statute authorized the operation of "[a]ny bingo game or a game of chance with comparable characteristics by or for participants conducted by an organization exempt from tax." The statute was short-lived, however, and was struck down by this court in *State v. Nelson,* 210 Kan. 439, 502 P.2d 841 (1972), as unconstitutional under Art. 15, § 3.

Following our decision in *Nelson,* several legislative initiatives concerning gambling, and in particular bingo, were introduced in the Kansas Legislature. One of the initiatives, S. Con. Res. 72, proposed amending the anti-lottery provision in the state constitution to permit an exception for games of bingo. The proposed amendment, which was approved by the legislature and later adopted by the people in the 1974 general election, permitted

games of bingo to be conducted by certain bona fide nonprofit organizations. The amendment, Art 15, § 3a, provides:

"Notwithstanding the provisions of section 3 of article 15 of the constitution of the state of Kansas the legislature may regulate, license and tax the operation or conduct of games of 'bingo,' as defined by law, by bona fide nonprofit religious, charitable, fraternal, educational and veterans organizations."

The 1975 legislature enacted enabling legislation, commonly known as the Bingo Act, providing for the licensure, regulation, and taxation of games of bingo. L. 1975, ch. 491, § 1 *et seq.*; see K.S.A. 79-4701 *et seq.* K.S.A. 79-4701(a) defined the term bingo and provided:

"(a) 'Bingo' means a game in which each participant must pay a charge and a prize or prizes are awarded to the winner or winners in which each participant receives one or more cards or in which a card or cards are included in a paper game program booklet each of which is marked off into 25 squares arranged in five horizontal rows of five squares each and five vertical rows of five squares each, with each square being designated by number, letter or combination of numbers and letters, and only the center square designated with the word 'free' with no two cards being identical, with the players covering squares as the operator of such game announces a number, letter or combination of numbers and letters appearing on an object selected by chance, either manually or mechanically from a receptacle in which have been placed objects bearing numbers, letters or combinations of numbers and letters corresponding to the system used for designating the squares, with the winner of each game being the player or players first properly covering a predetermined and announced pattern of squares upon the card or a card which is included in a paper game program booklet being used by such player or players."

In 1993, the legislature enacted a bill which authorized a new game called "instant bingo." K.S.A. 1993 Supp. 79-4701(c). In amending the 18-year-old Bingo Act, the legislature modified the definition of "bingo" to include both the "games of call bingo and instant bingo." The term "call" was given to the Act's original and existing definition of "bingo." K.S.A. 1993 Supp. 79-4701(c) defined the new game of instant bingo as follows:

"(c) 'Instant bingo' means a game: (1) In which each participant must pay a charge; (2) in which a prize or prizes are awarded to the winner or winners; (3) in which each participant receives one or more disposable tickets which accord a participant an opportunity to win something of value by opening, detaching or otherwise removing a cover from the ticket to reveal a set of numbers,

letters, symbols or configurations, or any combination thereof; (4) which is conducted by a licensee under this act; (5) the conduct of which must be in the presence of the participants; and (6) which does not utilize any dice, normal playing cards or slot machines."

K.S.A. 1993 Supp. 79-4704, K.S.A. 1993 Supp. 79-4705, and K.S.A. 1993 Supp. 79-4706 amended existing statutes to include provisions for the taxation and regulation of the new game of instant bingo.

Throughout this opinion we will refer to the 1993 amendments to K.S.A. 79-4701 *et seq.*, which authorized the implementation and operation of instant bingo, or pull tabs, as it is commonly known, simply as the instant bingo amendments unless reference is being made to a specific provision thereof.

Following the legislature's enactment of the instant bingo amendments, the Secretary forwarded to the Attorney General proposed rules and regulations providing for the registration of instant bingo ticket distributors. The Attorney General refused to approve the proposed rules and regulations, stating that the operation of instant bingo violated the Kansas Constitution's prohibition of lotteries. Following the Attorney General's refusal to act, the Secretary proceeded with the registration of instant bingo ticket distributors without approved rules and regulations.

On July 1, 1993, this action was filed in the district court. Following the filing of briefs and hearings in which all parties participated, the district court ruled that the amendments included in K.S.A. 79-4701 *et seq.* pertaining to the new game of instant bingo were constitutional. The State timely filed this appeal.

Before proceeding further we wish to note that there evidently was some confusion surrounding the procedure in the district court. Although the State had filed a motion for summary judgment, the parties in consultation with the court off the record apparently agreed that the only issue was one of law to determine the constitutionality of the questioned statutes. The district court treated the issue accordingly, with no objection from counsel, and in doing so stated:

"As I say, I believe that counsel—all this wasn't on the record or anything—we all agreed this was going to be a question of law and that we should get it

before the Court, and I don't think the Attorney General's or the Secretary's or the Intervenor's rights have been infringed on in presenting it in the manner in which it has.

"So, I think that—I'm not going to rule that there's anything improper procedurally in the case and find that it's according to—sufficiently conforms with the Supreme Court rules and the statutes and no one has been prejudiced by the procedure."

We agree with the district court judge's conclusions and the procedure utilized in this case and that none of the parties were prejudiced by the procedure followed in the district court. The argument of the State that summary judgment was granted improperly does not address a viable issue in this appeal.

The sole issue before this court is the constitutionality of the instant bingo amendments and the interpretation of Art. 15, § 3a of the Kansas Constitution. In considering the issue before us, it is appropriate to iterate some of the cardinal rules of constitutional construction. In *State ex rel. Schneider v. Kennedy,* 225 Kan. 13, 20-21, 587 P.2d 844 (1978), we stated:

"It is fundamental that our state constitution limits rather than confers powers. Where the constitutionality of a statute is involved, the question presented is, therefore, not whether the act is authorized by the constitution, but whether it is prohibited thereby. [Citations omitted.]

"The constitutionality of a statute is presumed, all doubts must be resolved in favor of its validity, and before the statute may be stricken down, it must clearly appear the statute violates the constitution. [Citations omitted.]

"In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it and if there is any reasonable way to construe the statute as constitutionally valid, that should be done. [Citations omitted.]

"Statutes are not stricken down unless the infringement of the superior law is clear beyond substantial doubt. [Citations omitted.]

"Courts do not strike down legislative enactments on the mere ground they fail to conform with a strictly legalistic definition [or] technically correct interpretation of constitutional provisions. The test is rather whether the legislation conforms with the common understanding of the masses at the time they adopted such provisions and the presumption is in favor of the natural and popular meaning in which the words were understood by the adopters. [Citations omitted.]

"The propriety, wisdom, necessity and expedience of legislation are exclusively matters for legislative determination and courts will not invalidate laws, otherwise constitutional, because the members of the court do not consider the statute in the public interest of the state, since, necessarily, what the views of members

of the court may be upon the subject is wholly immaterial and it is not the province nor the right of courts to determine the wisdom of legislation touching the public interest as that is a legislative function with which courts cannot interfere."

Additional rules are set forth in *Colorado Interstate Gas Co. v. Board of Morton County Comm'rs*, 247 Kan. 654, 660, 802 P.2d 584 (1990), as follows:

"In *Board of Wyandotte County Comm'rs v. Kansas Ave. Properties*, 246 Kan. 161, 786 P.2d 1141 (1990), we held:

'In ascertaining the meaning of a constitutional provision, the primary duty of the courts is to look to the intention of the makers and adopters of that provision.' Syl. ¶ 2.

'In interpreting and construing the constitutional amendment, the court must examine the language used and consider it in connection with the general surrounding facts and circumstances that cause the amendment to be submitted.' Syl. ¶ 3.

"A constitutional provision is not to be narrowly or technically construed, but its language should be interpreted to mean what the words imply to men of common understanding. [Citation omitted.] A constitution should not be interpreted in any refined or subtle sense, but should be held to mean what the words imply to the common understanding of men. [Citation omitted.] When interpreting the constitution, each word must be given due force and appropriate meaning."

For convenience we repeat Art. 15, § 3a:

"Notwithstanding the provisions of section 3 of article 15 of the constitution of the state of Kansas the legislature may regulate, license, and tax the operation or conduct of *games of 'bingo', as defined by law*, by bona fide nonprofit religious, charitable, fraternal, educational and veterans organizations." (Emphasis added.)

In this case, the State argues that the district court erred in its determination that the enactment of the instant bingo amendments was constitutional, because the operation of instant bingo or pull tabs is prohibited under Art. 15, § 3 of the Kansas Constitution as a lottery not authorized by Art. 15, § 3a. Specifically, the State maintains that the phrase "games of bingo," as used in Art. 15, § 3a, cannot be defined by the legislature to include instant bingo. It argues that absent an amendment to the constitution, instant bingo is unconstitutional. In essence, the State's argument is that instant bingo is not a "game of bingo" as voters

thought or intended when adopting Art. 15, § 3a, but instead is another form of lottery, tagged as a "game of bingo" by the legislature, but prohibited under Art. 15, § 3 of the constitution.

The Secretary dismisses the State's arguments as misplaced and flawed under the specific language of the constitutional amendment which provides for "games of 'bingo', as defined by law." She asserts that the plain language of Art. 15, § 3a specifically delegates the power to define "games of bingo" to the legislature. Furthermore, she maintains that the language recognizes that more than one type of bingo game exists by its use of the plural "games of bingo."

In the journal entry, the district court set out its reasoning for upholding the constitutionality of the instant bingo amendments. In relevant part, the court held:

"1. Article 15, section 3a of the Kansas Constitution does not limit the Kansas legislature to regulating the conduct of only the classic forms of 'bingo' by bona fide nonprofit religious, charitable, fraternal, educational and veterans organizations.

"2. There is no universal rule or standard definition of 'bingo' and Article 15, section 3a of the Kansas Constitution allows the Kansas legislature to define bingo.

"3. 'Instant bingo' as defined in 1993 Session Laws Chapter 155 falls within the definition of bingo as applied in other jurisdictions and the legislature has not exceeded its bounds by defining 'instant bingo' as 'bingo.'

"4. Article 15, section 3a of the Kansas Constitution itself contemplates more than a single definition of 'bingo' by use of the plural of the word games. If only one form of the game were contemplated, the amendment would have stated that intent rather than allow the legislature to regulate the conduct of 'games of bingo.'

"5. Use of the language 'as defined by law' in Article 15, section 3a of the Kansas Constitution is further indication that the voters intended the legislature to define 'bingo' and that various games would be defined as 'games of bingo.'"

The reasoning set forth in the district court's ruling, which parallels the arguments posited by the Secretary, are three-fold in nature: (1) a general recognition that there is no one universal or standard definition of the game "bingo"; (2) the language of the amendment recognizes this fact by its use of the plural "games of bingo"; and (3) the plain language of the amendment specifically authorizes the legislature to define the term "bingo."

As the principal issue in this case is the proper interpretation of the scope of Art. 15, § 3a, it is necessary to initially examine any legislative history attending the passage of the constitutional amendment and the enactment of subsequent implementing legislation and amendments made thereto. Unfortunately, the record is void of any material evidence of what legislators or voters thought or intended when they voted to approve Art. 15, § 3a. Additionally, S. Con. Res. 72, which proposed the amendment, failed to provide any meaningful explanatory note for the voters.

Shortly following the adoption of Art. 15, § 3a, the legislature enacted what has come to be known as the "Bingo Act", K.S.A. 1975 Supp. 79-4701 *et seq.* While providing for the regulatory, licensing, and taxation scheme for the operation of bingo games, the legislation also defined the term "bingo" as set forth earlier in this opinion. The legislative history demonstrates that legislators had no disagreement over the definition which was adopted. The Intervenor and numerous other nonprofit organizations which were instrumental in obtaining the passage of the constitutional amendment also participated in the hearings on the proposed implementing legislation. Bingo as defined in the 1975 legislation apparently was satisfactory to all interested participants. The record also demonstrates that the terms "instant" bingo and "call" bingo were never discussed. The term "call" was attached to the original 1975 definition of "bingo" with the recent enactment of the instant bingo amendments. K.S.A. 1993 Supp. 79-4701(b). The State asserts that this fact alone supports its argument that neither the legislators nor voters envisioned "instant bingo" when they approved Art. 15, § 3a.

A review of the legislative history attending passage of the 1993 instant bingo amendments does, however, confirm the State's argument that legislators and voters were not voting for instant bingo, or pull tabs, when they approved Art. 15, § 3a. Written testimony by one of the principal sponsors of the amendments, State Senator Lana Oleen, indicates that "instant bingo" was a "new bingo-type game." In fact, most of the references made to instant bingo included the descriptive phrase "new bingo-type game." The sole objective of the legislature, as revealed by the

history of the instant bingo amendments, was to find a new source of revenue for the nonprofit organizations described in Art. 15, § 3a and for the taxes that would result from the expansion of gambling.

The State has consistently maintained that pull tab games are violative of the state constitution's anti-lottery provision. In response to an inquiry in 1987 by a state legislator, the Attorney General opined:

"You ask whether K.S.A. 79-4701 *et seq.,* 'the bingo act,' can effectively be amended legislatively to include pull tab games, thus circumventing the requirements of constitutional amendment and public referendum.

"There are three essential elements of a lottery: (1) consideration, (2) prize and (3) chance. K.S.A. 1986 Supp. 21-4302. See also *State, ex rel. v. Highwood Services, Inc.,* 205 Kan. 821, 825 (1970). In Attorney General Opinion No. 87-16 this office indicated that: 'the game of pull tabs would fall within the scope of the Kansas Constitutional Lottery Amendment [Art. 15, § 3c] . . . . [t]he amendment is an unrestricted provision that would include any game that meets the three essential elements of (1) consideration, (2) prize and (3) chance.' In *State v. Nelson,* 210 Kan. 439 (1972), the Kansas Supreme Court concluded that since the Kansas Constitution prohibited lotteries, the legislature could not legalize bingo (which was, by definition, a lottery) by simply changing the definition of consideration to exclude bingo games. *Id.* at 445. It was necessary to amend the constitution to permit bingo. Kan. Const., Art. 15, § 3a. Following the *State v. Nelson* rationale, two additional amendments to the constitution were passed to allow for parimutuel wagering at dog and horse races and for a state owned and operated lottery. Kan Const., Art. 15, §§ 3b, 3c (1986).

"*In that pull tab games are but another form of lottery, the State could utilize pull tab games within the state-owned and operated lottery. However, such games may not be legalized for others to operate simply by passing legislation. It would require both a constitutional amendment and a public referendum to legalize such games under those circumstances. To allow otherwise would circumvent both the intent of the constitution and the people of Kansas.*" (Emphasis added.) Att'y Gen. Op. No. 87-171.

The 1993 legislature attempted to avoid the obvious by merely electing to change the name of pull tab games to "instant bingo."

All parties to this appeal readily concede (1) that instant bingo is a lottery under Art. 15, § 3; (2) that except as provided in Art. 15, §§ 3a, 3b, and 3c, all lotteries are prohibited; and (3) to be constitutional, instant bingo must fall within the term "games of 'bingo,' as defined by law" contained in Art. 15, § 3a.

The parties also concede that the legislature is subject to some limitations on what it can realistically define as a game of bingo under Art. 15, § 3a. The Intervenor states in its brief:

"Defendant Intervenor does not contend that simply because a game is called bingo that it is then a bingo game. . . . [S]lot machines, roulette wheels, craps, card games, poker and other such games, are not bingo, and should not be interpreted as being bingo under the current constitutional provision. Defendant Intervenor believes that those games are clearly distinguished from bingo games by the elements of the activity itself."

Thus, the issue before us is whether the game of pull tabs, now called instant bingo by the legislature, has sufficient similar characteristics to traditional bingo, now called call bingo, to be considered a game of bingo within Art. 15, § 3a.

In reaching our decision, it must be recognized that the overriding prohibition of the Kansas Constitution is that "[l]otteries and the sale of lottery tickets are forever prohibited." Art. 15, § 3. As stated in *State v. Nelson*, 210 Kan. 439, 502 P.2d 841 (1972), wherein the legislature attempted to legalize bingo and slot machines:

"Although this constitutional provision was undoubtedly borrowed from states previously admitted to statehood, it is apparent that the framers of the constitution of this state conscientiously determined that prohibiting lotteries forever was a method of promoting a sound basis for the welfare and growth of this state. Since its adoption, many efforts have been made by persons and organizations to circumvent this constitutional provision. Such efforts have generally been made for profit, seeking to elicit money from those who cannot refrain from the instinctive weakness of humanity to gamble.

"This court has steadfastly adhered to the constitutional provision by striking down such efforts. . . .

. . . .

"It is the function and duty of this court to define constitutional provisions. . . .

". . . The constitution must be interpreted and given effect as the paramount law of the state, according to the spirit and intent of its framers. A legislative enactment in evasion of the terms of the constitution, as properly interpreted by the courts and frustrating its general and clearly expressed or necessarily implied purpose, is clearly void." 210 Kan. at 444-45.

In *State, ex rel., v. Kalb*, 218 Kan. 459, 543 P.2d 872 (1975), this court struck down an attempt of the legislature to authorize

bingo by Class A private clubs. In holding the statute violated Art. 15, § 3a, the court stated: "The legislature cannot authorize the playing of bingo beyond the limits permitted by the constitution." 218 Kan. at 465.

The parties, before the trial court, and in this court, go to great lengths to provide various dictionary definitions of bingo. The parties provide definitions found in such diverse sources as The American Heritage Dictionary (1982); American Heritage Dictionary of the English Language (1969); Webster's 9th New Collegiate Dictionary (1983); Longman's Dictionary of English Language (1984); American Heritage Dictionary of English Language (1992); Collins Cobuild English Language (1987); The Oxford Modern English Dictionary (1992); The Random House College Dictionary (1979); Standard College Dictionary (1957); Comprehensive Desk Dictionary (1967); Webster's Seventh New Collegiate Dictionary (1967); Funk & Wagnalls New Standard Dictionary of the English Language (1913); Webster's Dictionary (2d ed. 1945); Webster's Dictionary (3d ed. 1971); The Barnhart Dictionary of Etymology (1988); and The Oxford English Dictionary (2d ed. 1989).

The Secretary and Intervenor rely upon these various dictionary definitions to support their argument that there is no universal or standard definition of the term "bingo" and that the district court was correct in its finding to that effect. They then submit that the legislature, under its constitutional power to define games of bingo, was authorized to define the newly named instant bingo as a game of bingo.

The State, on the other hand, relies on the numerous definitions to support its argument that there are certain basic characteristics of bingo that are present in all the definitions that are not present in instant bingo as defined in K.S.A. 1993 Supp. 79-4701(c).

We agree with the Secretary and the Intervenor, and the State does not seriously contend otherwise, that the terms "games of bingo" in Art. 15, § 3a may logically be construed to mean more than the traditional game of bingo familiar to nearly everyone and as originally defined in the Bingo Act. However, we think it is

beyond fair dispute that games of bingo which depart from the general understanding of traditional bingo must fall within the same general category of games and have the basic characteristics common to all such games.

The Intervenor goes to great lengths to assert that the State would ban any type of game that deviated from the traditional bingo cards of 5 rows by 5 rows with 25 squares utilizing 24 numbers with a free square in the middle. It then goes on to point out that English bingo uses a card with 3 rows, 9 columns, and 90 numbers and that Canadian bingo utilizes cards different from either of the other two. It also points out that there are similar games such as keno, beano, lotto, and others.

The State's position is not as narrow as the Intervenor would contend. It is the position of the State that while there may be games other than traditional bingo which could constitutionally be defined as "games of bingo" by the legislature, pull tabs or instant bingo is not one of them.

While this court has had the opportunity to review Art. 15, § 3a on two previous occasions, neither occasion involved the specific relevant language and particular issue now under review. See *State, ex. rel., v. Kalb*, 218 Kan. 459 (whether a class A private club, with a federal income tax exemption, was eligible for a bingo license); *Bingo Catering & Supplies, Inc. v. Duncan*, 237 Kan. 352, 699 P.2d 512 (1985) (whether recently enacted statutory restrictions regarding the operation of bingo games were constitutional). As the issue now before us is one of first impression in Kansas, a review of relevant case law from other jurisdictions is appropriate. Unfortunately, our research has disclosed only two cases on point, and they reach opposite results.

The defendants, as did the trial court, rely upon *People v. 8,000 Punchboard Card Devices*, 142 Cal. App. 3d 618, 191 Cal. Rptr. 154 (1983), wherein the California Court of Appeal reviewed the language of a 1976 amendment to the state's constitution which permitted the operation of bingo games for charitable purposes. The specific language of the amendment provided in part that "the Legislature by statute may authorize cities and counties to provide for bingo games, but only for charitable purposes." Prior

to the adoption of the amendment, the legislature had enacted enabling legislation in case the amendment was approved. The legislation defined bingo as "a game of chance in which prizes are awarded on the basis of designated numbers or symbols on a card which conform to numbers or symbols selected at random." The definition did not include "punchboards," which had been declared as illegal slot machines in the state's penal code since 1953. The penal code defined "punchboards" as follows: "[A]ny card, board or other device which may be played or operated by pulling, pressing, punching out or otherwise removing any slip, tab, paper or other substance therefrom to disclose any concealed number, name, or symbol." 142 Cal. App. 3d at 620.

Three years following the adoption of the constitutional amendment, the legislature amended the statutory definition of bingo to include punchboards. The question presented to the court was whether the amended definition was in violation of the constitutional amendment's intent. The Alameda District Attorney argued that "the electorate intended the term 'bingo' in the constitutional amendment to be defined as it was in the original enabling legislation." In reviewing the question, the California court noted that the applicable indicators of the intent behind a constitutional amendment included "ballot arguments favoring the amendment . . . the common meaning of the words used, . . . and any statutory definitions existing at the time of the amendment." In this instance, the court concluded that none of the listed indicators demonstrated any "clear import" as to the meaning of the word bingo. 142 Cal. App. 3d at 620.

The district attorney argued that the "traditionally understood" meaning of the word bingo was the definition set forth in the original enabling legislation. In reviewing the issue, however, the court discovered that various definitions of the word bingo existed. In relevant part, the court noted:

"One source identifies bingo as '[a] game of the same general class as "Tango" or "Tango games." Tango games are said to include a number of similar games (including 'Beano,' 'Bingo,' 'Bonanza,' 'Horse Racer,' 'Keno,' 'Monaco,' 'Plaza B,' 'Plaza 7,' 'Ritz,' 'Skill Ball,' and 'Wheel O') in which the winner covers a required number of figures in a row on a card, with the figures to be covered

determined in a variety of ways. (38 C.J.S., Gaming, § 1, pp. 38, 43.) Another source states that the term 'bingo' has previously been used to describe raffles run by motion picture houses (in which moviegoers were given a numbered slip of paper, and a duplicate was placed in a paper bag and subject to a drawing or a wheel was spun to determine the winning number), as well as a 19th century game played with dominoes. (Scarne, Scarne's New Complete Guide to Gambling (1974) p. 209.) In 1951 the California Attorney General determined a number of games to be 'variations of the game commonly called Bingo,' including 'Canast-O,' 'Black-Out,' 'Vogue,' 'Jade,' 'Cameo,' and 'Shamrock' ( in which numbers on a card are filled as determined by players' tosses of balls into numbered cups), and 'Skill Quiz Lecture,' 'Skill Quiz Game,' and 'Klu Quiz Game' (in which players are required to fill a row of numbers on a card and then answer a quiz question correctly)." 142 Cal. App. 3d at 621-22.

The court concluded that there was no common meaning of the word bingo and held that "punchboard bingo" was not "unreasonable or clearly inconsistent" with the constitutional provision. 142 Cal. App. 3d at 622.

*City of Piedmont v. Evans,* 642 So. 2d 435 (Ala. 1994), which addressed the same question, reached a contrary result. In *Evans,* the Alabama Supreme Court was asked to determine whether "instant bingo" fell within the meaning of the term "bingo" as allowed by a recent amendment to the state's constitution. In 1989, the voters adopted amendment 508 to the state's constitution, permitting the operation of bingo games in Calhoun County by certain nonprofit organizations. Following the amendment's adoption, the City of Piedmont, located in Calhoun County, enacted a local ordinance providing for the operation of both "bingo" and "instant bingo" games. Instant bingo was defined in the ordinance as:

"A single banded ticket or card each with its face covered to conceal one or more numbers or symbols where one or more cards or tickets in each set has been designated in advance as a winner. Participants at a designated time of play are required to remove the front cover of the Bingo card to determine if that card holder has the required designated numbers or symbols to be declared a winner." 642 So. 2d at 436.

Another ordinance of the City of Piedmont defined bingo as:

"[t]hat specific kind of game, or enterprise, commonly known as 'bingo,' in which prizes are awarded on the basis of designated numbers, or symbols, which are drawn, at random, by the operator of said game and which are placed by the

persons playing, or participating in said game, on cards, or sheets of paper, which contain, or set out, numbered spaces, upon which said designated numbers or symbols may be placed by the persons playing or participating in said game." 642 So. 2d at 437.

In concluding that "instant bingo" did not fall within the constitutional provision authorizing bingo, the court stated:

" 'Instant bingo' does not constitute 'bingo' as allowed by Amendment No. 508 of the Constitution of Alabama. 'Instant bingo' is a separate and distinct type of lottery from the lottery of 'bingo.' It does not even fall within the definition of bingo found in [the ordinance]." 642 So. 2d at 436-37.

The court went on to hold:

"Since the only lottery authorized to be operated in Calhoun County by Amendment No. 508 is the lottery of bingo, 'instant bingo' constitutes an illegal lottery under the Constitution of Alabama and Piedmont Municipal Ordinance No. 413 is therefore unconstitutional." 642 So. 2d at 437.

We do not find either of these cases particularly helpful or persuasive in our determination of the issue before us. It is axiomatic that the legislature cannot authorize the playing of "games of bingo" beyond the limits permitted in Art 15, § 3a. *State, ex. rel., v. Kalb,* 218 Kan. at 465. However, what is not self-evident is exactly what are those prescribed limits.

Nearly every child and family has at one time or another participated in traditional or call-type bingo games, as a parlor game at home strictly as a family pastime or, in the case of adults, in ·establishments such as that of the Intervenor where gambling and a social function were involved.

As we have no clear precedent to guide us, we are limited to determining whether instant bingo contains enough of the basic elements or characteristics of bingo to be lawfully defined as a game of bingo. The Intervenor in its brief lists what it denotes as "fundamental, essential characteristics" of both bingo and instant bingo which it asserts bring instant bingo within the realm of constitutional "games of bingo." We have carefully reviewed the alleged similarities and, rather than discuss each one, suffice it to say we are not persuaded by them. They include generalities such as both games involve cards, the amount that may be wagered is regulated, the types of organizations that can participate

are similar, the proceeds go to a nonprofit entity, and both are subject to taxation. These so-called basic elements or characteristics are nothing more than a play upon the words of the constitution and the statutes regulating bingo. We find none of them to be a true characteristic inherent in bingo or similar games.

In reviewing the numerous definitions of bingo and bingo-type games submitted by industrious counsel, there are definite characteristics common to and inherent in bingo-type games. All definitions include the requirement of a card or paper utilizing numerous numbers which are to be covered or marked if and when one of the numbers is drawn by lot and announced by a caller or selected through some other similar method. Bingo-type games contemplate a group activity, often social, with several participants. The object of the game is to be the first to complete the pattern prescribed for that particular bingo-type game from the numbers called. Instant bingo utilizes a small pull tab card where the activity may be only one on one between the player and the seller of the card. As such, it does not have the group participation required of bingo-type games.

In bingo, each game lasts several minutes with the participants hoping to be the first to complete a winning line on their cards. In instant bingo the result is instantaneous with the pulling open of the tab or tabs which will reveal whether the player has won or lost. The basic elements or characteristics of games of bingo, as generally understood and as defined by knowledgeable authorities, are totally lacking in instant bingo. In fact, instant bingo has characteristics far more similar to slot machines, punchboards, and other forms of gaming rather than to bingo-type games.

The legislature, with the help of organizations such as the Intervenor, defined bingo in 1975 in K.S.A. 1975 Supp. 79-4701(a), and in doing so carefully described traditional or call bingo. It is logical to assume that in doing so, the legislature, representing the people of Kansas, defined bingo as it was commonly understood by the voters when they approved Art. 15, § 3a of the constitution. We do not think anyone could seriously argue to the contrary. Although the legislature was granted the power to define games of bingo in Art. 15, § 3a, that amendment does not grant the legislature carte blanche in adopting such definitions.

Following the adoption by the electorate in 1986 of Art. 15, § 3c amending the Kansas Constitution, the legislature in 1987 passed the Kansas Lottery Act, K.S.A. 74-8701 *et seq.* The legislation implemented the recent constitutional amendment which authorized the legislature to provide for a State-owned and operated lottery. K.S.A. 74-8710 provided that the Kansas lottery commission shall adopt rules and regulations governing the establishment and operation of the State lottery. K.S.A. 74-8710(a) designated the types of lottery games which may be operated by the State and reads:

"The types of lottery games to be conducted, including but not limited to *instant lottery,* on-line and traditional games, but not including games on video lottery machines." (Emphasis added.)

Instant lottery is merely another form of pull-tab type games which the legislature recognized as falling within the purview of the Kansas lottery, as did the Attorney General in the opinion set forth earlier in this opinion. Att'y Gen. Op. No. 87-171. The legislature cannot now merely adopt the new name of "instant bingo" and authorize a lottery under Art. 15, § 3a. This is the exclusive province of the State under Art. 15, § 3c.

While we recognize the broad power of the legislature under Art. 15, § 3a, we are of the opinion that in defining games of bingo such definition must bear a reasonable and recognizable similarity to the many definitions of bingo and other bingo-type games furnished by counsel and to the common understanding of the term by the people of Kansas. We conclude that the attempt to define pull tab games as games of bingo fails the necessary test and that the legislature has overstepped its bounds with the enactment of the instant bingo amendments. The definition of instant bingo in K.S.A. 1993 Supp. 79-4701(c) exceeds the power granted the legislature to define games of bingo in Art. 15, § 3a and is unconstitutional.

We conclude that K.S.A. 1993 Supp. 79-4701(c) and the related amendments to K.S.A. 79-4701 *et seq.* pertaining to instant bingo are unconstitutional. The district court is reversed, and the case is remanded with directions to grant the State appropriate relief.

Reversed and remanded.

SIX, J., dissenting: I would affirm the district court and hold that K.S.A. 1993 Supp. 79-4701(c) is constitutional. The majority dons a policy-making hat in rejecting the constitutional mandate given to the legislature to "define bingo."

Kan. Const. art. 15, § 3 is a ban on lotteries. Art. 15, § 3a permits an exception to the ban and allows the legislature to regulate "the conduct of games of 'bingo,' as defined by law" to benefit bona fide nonprofit organizations. Art. 15, § 3a specifically gives the legislature, in conjunction with the governor, the power to define games of bingo. The legislature exercised its definitional power in adopting K.S.A. 1993 Supp. 79-4701(c).

The majority substitutes its own "common understanding" of the definition of "bingo" in order to compensate for the lack of evidence about what the framers and voters understood to be "bingo" when Art. 15, § 3a was passed. In doing so, the majority, in my opinion, devalues the pertinent constitutional language.

My analysis begins with the bingo amendment:

"Notwithstanding the provisions of section 3 of article 15 of the constitution of the state of Kansas, the legislature may regulate, license and tax the operation or conduct of games of 'bingo,' *as defined by law*, by bona fide nonprofit religious, charitable, fraternal, educational and veterans organizations.' " Art. 15, § 3a. (Emphasis added.)

An examination of the bingo amendment brings two concepts into focus. First, Art. 15, § 3a specifically states "games of 'bingo' " shall be "defined by law." As the majority notes, the record is void of any evidence actually demonstrating what the framers or voters envisioned as "bingo" when they approved Art. 15, § 3a. The plain language in the amendment, however, indicates that the framers and voters intended to delegate the power to define "games of 'bingo' " to the legislature. Thus, the voters' common understanding at the time the amendment was adopted must have been that the legislature would define "games of 'bingo.' "

Second, Art. 15, § 3a speaks in the plural, "games of 'bingo.' " Despite the plain wording of the amendment, the majority reasons that voters envisioned only one type of bingo (what the majority concludes from its collective personal experience is "tra-

ditional bingo"). If voters had intended to authorize the legislature to approve only one version of "bingo," there would have been no need to use the plural "games" in the amendment. The concept that there were various kinds of bingo games was not new *to Kansas* in 1974 when Art. 15, § 3a was adopted. In 1972, this court considered arguments that "bingo" had different meanings. See *State v. Nelson*, 210 Kan. 439, 448, 502 P.2d 841 (1972) (Kaul, J., concurring.). In *Nelson*, Justice Kaul referenced Webster's Third New International Dictionary (unabridged) in noting that "bingo" had been defined as a game similar to lotto or keno on a card with a five-number grid or a dice game with petty merchandise as stakes. 210 Kan. at 448.

" 'In ascertaining the meaning of a constitutional provision courts consider the circumstances attending its adoption.' " *State ex rel. Braun v. A Tract of Land*, 16 Kan. App. 2d 757, 760, 829 P.2d 600 (quoting *Wall v. Harrison*, 201 Kan. 600, 603, 443 P.2d 266 [1968]), *aff'd* 251 Kan. 685, 840 P.2d 453 (1992). Thus, the history of the efforts to legalize bingo playing in Kansas as related by the majority is relevant. However, by declaring K.S.A. 1993 Supp. 79-4701(c) unconstitutional, the majority assumes the legislative role of defining "bingo." The majority acknowledges, "As we have no clear precedent to guide us we are limited to determining whether instant bingo contains enough of the basic elements or characteristics of bingo to be lawfully defined as a game of bingo." The majority's reasoning might be persuasive if the amendment simply allowed the legislature to regulate "games of bingo to benefit certain nonprofit organizations." If the amendment had been drafted that way, the phrase "games of bingo" would require definition. If no "clear precedent" supplied a definition, this court would indeed be "limited to determining whether instant bingo contains enough of the basic elements" of bingo to come within that definition. But, that is not how Art. 15, § 3a reads. The framers of Art. 15, § 3a may have understood that over the course of time, "bingo" has meant a variety of games and, consequently, specifically delegated the responsibility for defining "games of 'bingo' " to the legislature.

Implicit in the majority's reasoning is a concern that the legislature acted imprudently in defining "instant bingo" as bingo.

We have addressed the court's role as legislative critic in the past. The teaching is clear:

"Our constitution does not make this court the critic of the legislature; rather, this court is the guardian of the constitution and every legislative act comes before us with a presumption of constitutionality. . . . In determining whether a statute is constitutional, courts must guard against substituting their views on economic or social policy for those of the legislature. Courts are only concerned with the legislative power to enact statutes, not with the wisdom behind those enactments. When a legislative act is appropriately challenged as not conforming to a constitutional mandate, the function of the court is to lay the constitutional provision invoked beside the challenged statute and decide whether the latter squares with the former—that is to say, the function of the court is merely to ascertain and declare whether legislation was enacted in accordance with or in contravention of the constitution—and not to approve or condemn the underlying policy." *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, 348-49, 789 P.2d 541 (1990).

Two states, California and Alabama, have considered similar bingo issues. Both cases, *People v. 8,000 Punchboard Card Devices,* 142 Cal. App. 3d 618, 191 Cal. Rptr. 154 (1983), and *City of Piedmont v. Evans*, 642 So. 2d 435 (Ala. 1994), are discussed by the majority. If anything, *Punchboard* and *City of Piedmont* indirectly support the constitutionality of K.S.A. 1993 Supp. 79-4701(c). In *Punchboard*, the State of California unsuccessfully advanced the same argument on behalf of California that the Kansas Attorney General's office has presented to us. The California Court of Appeal stated:

"Neither the express language of article IV, section 19, subdivision (c) [of the California Constitution] nor any clear import to be divined from the constitutional amendment, demonstrate that the statutory definition of bingo as amended in 1979 is unreasonable or clearly inconsistent with the Constitution. We therefore cannot accept the Attorney General's view that punchboard bingo is not constitutionally authorized." 142 Cal. App. 3d at 622.

Of marked significance is the language the California Constitution did not contain but which the Kansas framers included in Art. 15, § 3a, *i.e.*, "games of 'bingo' as defined by law." The California Constitution states that " 'the Legislature by statute may authorize cities and counties to provide for bingo games, but only for charitable purposes.' " 142 Cal. App. 3d at 620. No constitutional responsibility for defining bingo games was given to the

California Legislature, yet the California Court of Appeal still deferred to the legislature's decision upon concluding that "bingo" could mean many different things. Consequently, *Punchboard* weighs in favor of the constitutionality of K.S.A. 1993 Supp. 79-4701(c) under a Kansas Constitution that entrusts the definition of bingo to the legislature.

Of equal significance is the language not found in the Alabama Constitution reviewed in *City of Piedmont*.

The constitutional language at issue in *City of Piedmont* is:

> **"Amendment No. 508**
>
> "BINGO GAMES IN CALHOUN COUNTY.
>
> "The operation of bingo games for prizes or money by certain nonprofit organizations for charitable, educational, or other lawful purposes shall be legal in Calhoun county, subject to the provisions of any resolution or ordinance by the county governing body or the governing bodies of the respective cities and towns, within their respective jurisdictions *as provided by law regulating such operation.* The said governing bodies shall have the authority to promulgate rules and regulations for the issuance of permits or licenses and *for operation* of bingo games, within their respective jurisdictions . . . ." (Emphasis added.) Ala. Const., Amend. No. 508, Vol. 2, Ala. Code (1990).

The result in *City of Piedmont* is understandable. The people of Alabama did not vest the authority to "define games of bingo" in either the Alabama Legislature or the various governing bodies of Calhoun County.

The majority quotes the observations as to the various types of bingo in *Punchboard*, 142 Cal. App. 3d at 621-22. I also agree with the majority's determination that the record lacks any evidence which would indicate what the framers and voters thought or intended when approving the language in Art. 15, § 3a. Therefore, we are restricted to examining the plain language of the amendment, giving each word due force and applying the common meaning of the words used. The relevant language of the amendment grants the legislature full authority in defining the term "bingo." The constitution places the responsibility for defining "bingo" with the legislature, not with this court. The majority defines bingo based upon the configuration of the numbers on a card and the process selected by the legislature to determine the winning combination of numbers.

I conclude that the more plausible explanation of the usage of the plural for the word game indicates a contemplation of the existence of more than one type of "bingo game." The question is whether it is rational to conclude that "instant bingo" is in fact a "game of bingo" which may have been contemplated. My view is influenced by the conclusion in *Punchboard* that no common meaning of the term bingo exists. 142 Cal. App. 3d at 622.

The majority glides over the character of the two games by noting, "We have carefully reviewed the alleged similarities and, rather than discuss each one, suffice it to say we are not persuaded by them. . . . These so-called basic elements or characteristics are nothing more than a play upon the words of the constitution and the statutes regulating bingo. We find none of them to be a true characteristic inherent in bingo or similar games." I do not agree. A review of the elements of call bingo and instant bingo suggests similarities in the games. Both are games of chance that: (1) involve pre-printed cards; (2) provide the player an opportunity to win or lose that is determined by the particular card first purchased or acquired; the games are won or lost when the cards are purchased, as no two cards are identical; (3) regulate the amount that any individual can wager; (4) preserve the requirement that the game be operated only by nonprofit charitable, educational, religious, fraternal, or veterans organizations; (5) announce the prize and guarantee a winner or winners out of a finite number of participants; (6) ensure that proceeds derived from the operation of the game do not go to any individual interest but are for the benefit of the appropriate nonprofit entity conducting the game; (7) require players to play against each other and not against the "house"; (8) are conducted in the presence of the participants; and (9) subject the operation and conduct of the games to taxation to pay for the cost of licensing, inspecting, and regulating the conduct of the game, as well as to pay for other programs under state control. K.S.A. 1993 Supp. 79-4701; K.S.A. 1993 Supp. 79-4704. While I agree that the legislature's authority to define "games of bingo" is not unlimited, I view the K.S.A. 1993 Supp. 79-4701(c) game of "instant bingo" as an envisioned expansion of the constitutional mandate set forth in Art. 15, § 3a.

I separate from the majority over the emphasis to be placed on the Art. 15, § 3a constitutional grant to the legislature as the branch of government to define "games of bingo." Specifically pinpointing legislative definitional authority appears unique to the Kansas Constitution. The parties have not directed us to a similar constitutional provision. Rather than crafting a rationale dependent on the anecdotal remembrances of what the majority thinks bingo should be, I would leave the definitional responsibility for "games of bingo" where the constitution put it, with the legislature.

DAVIS, J., joins the foregoing dissenting opinion.