Dear Mr. Riddle:
You have asked for our opinion whether a game called MegaMania may be operated under a Class NG bingo license in Calvert County.
In our opinion, the on-line game that is described in the materials that you have provided is "bingo" within the meaning of the statute that permits commercial bingo in Calvert County. However, those materials also indicate that the game would not be conducted by the licensee, nor would it be conducted withinCalvert County. Accordingly, MegaMania as it is currently designed is not among the activities authorized for a Class NG bingo licensee in Calvert County.[1]
 I Background
A. MegaMania
MegaMania, as it is currently operated, permits players at gaming facilities nationwide to participate in a single, linked simultaneous bingo game in which all of the players compete against one another.[2] Players deposit money with a clerk and receive a PIN number to enter into a MegaMania terminal, known as an Electronic Player Station ("EPS"). The EPS displays randomly generated cards, which simulate traditional bingo cards. Each player may play up to four cards at an initial cost of 25¢ per card.
After each set of three numbers are called, players may reject cards or pay an additional 25¢ per card to continue playing those that are retained. This fee is deducted from the player's initial deposit. When the initial deposit is exhausted, additional money can be inserted directly into the EPS. A player cashes out by taking the PIN number receipt back to the clerk to collect any money left on deposit and any prizes.
Play does not start unless there are at least 48 cards in play by at least 12 players. There does not appear to be an upper limit on how many can play. The numbers for the game are drawn live at a bingo facility on Indian lands in the western United States. The numbers drawn are displayed on the EPS and also announced through an audio transmission. The corresponding numbers on a card are covered automatically when the player presses a "daub" button on the terminal. When the first player or players covers a straight line on a card, he or she declares "bingo" on one or more cards by pressing the daub button. All players are then notified electronically.
The winners' prizes are determined by the number of cards being played, the number of balls that have been drawn, and the number of players achieving bingo simultaneously. If a player fails to notice a "bingo" and press the daub button within a certain time, play continues. Prizes may also be won by covering all four corners of the card.
B. Licenses for Bingo in Calvert County
Ordinarily, it is a criminal violation to keep a gaming table or a place for gambling. Annotated Code of Maryland, Article 27, §§ 237, 240, and 241. A person operating a MegaMania game in Calvert County would thus be in violation of the criminal law unless its operation were otherwise sanctioned by law.
Commercial bingo is permitted in Calvert County under licenses issued by the County Commissioners.[3] Article 27, § 259A. A license authorizes the licensee to "operate a bingo game; subject however to the limitations upon seating and player capacity established for such license." Article 27, § 259A(b)(2). While most classes of licenses for commercial bingo have limitations as to seating and player capacity and as to the amount of the prize that can be awarded, none of these limitations apply to a Class NG licensee. Article 27, § 259A(b)(1)-(2).
C. Definition of "Bingo"
There is no statutory definition of "bingo" in Maryland. Neither Article 27, § 259A, nor any of the other statutory provisions that authorize various organizations to conduct bingo, define that term other than to state whether it includes instant bingo. See, e.g., Article 27, §§ 252(m), 254(a)(2), 259A(a)(1), 260(a), and 261(a).
In Bender v. Arundel Arena, 248 Md. 181, 236 A.2d 7 (1967), the Court of Appeals relied on Webster's Third New International Dictionary, which defines bingo as "a game played usu. for a pool with cards bearing rows of numbers in which a caller draws numbered counters from a stock and each player covers the corresponding numbers if they appear on his card, the winner being the one who first covers one complete row." A subsequent opinion of this Office described the game in greater detail:
 By contrast, the traditional game of bingo is commonly played in lodges, halls, and church basements, or permanent `bingo parlors' and requires tables and chairs for the players as well as a variety of other equipment. Each player receives one or more cards and chips or other markers to cover squares on the card. The game is further described as follows:
 "The cards, made of cardboard or paper, are printed with five rows of five squares each. One letter of the word BINGO appears over each of the vertical columns. All of the squares contain a number, except the `free' center square. Numbers 1 through 75 are used. The `B' column usually contains any five number between 1 and 15; the `I' column, any five between 16 and 30; and so on."
 "The purpose of the game is to cover enough called numbers to form a pattern — usually a vertical, horizontal, or diagonal line, or four corners. There are also many special games and gimmicks designed to increase participation."
 Commission on the Review of the National Policy Toward Gambling, Gambling in America 160 (1976). This report goes on to describe the manner of play as follows:
 "In a typical game, the announcer calls a letter and number, randomly selected from 75 ping-pong-type balls printed with a letter from the word BINGO and a number from 1 to 75, in the same groupings as the cards. As these numbers are called, the balls are placed on a master board containing all the letters and numbers to form a record of the game."
 The game continues until someone forms a winning pattern, shouts `BINGO.' and claims the prize. Id.
 The traditional game of bingo holds a unique position among the various forms of gambling, because many people do not consider it true gambling at all. Id. Bingo sessions are usually run or sponsored by charitable organizations and, therefore, people tend to attribute to it a respectability they would not accord other forms of gambling, such as numbers playing.
78 Opinions of the Attorney General ___ (1993); [Opinion No. No. 93-047 (November 15, 1993)].
These definitions generally accord with those found in other sources. See Annot., Games of Chance or Skill, 135 A.L.R. 104 (1941); State v. Parrish, 887 P.2d 127 (Kan. 1994).
 II Discussion
A. MegaMania as Bingo Under Federal Case Law
The relationship of MegaMania to the game of bingo has been considered by two federal courts. See United States v. 103Gaming Devices, ___ F. Supp.2d ___, 1998 WL 827586 (N.D. Cal. 1998); and United States v. 162 MegaMania Gambling Devices, No. 97-C-1140-K (N.D. Okla. October 26, 1998). The question before those courts was whether MegaMania is bingo or a game similar to bingo, or is instead an "electronic or electromechanical facsimile of any game of chance or slot machine . . . of any kind" for purposes of the federal Indian Gaming Regulatory Act (IGRA). Under IGRA, bingo and games similar to bingo are classified as Class II gaming and are permissible on Indian lands if the state where the Indian lands are located permits such gaming. 25 U.S.C. § 2710(b)(1). By contrast, electronic facsimiles and other machines are classified as Class III gaming, which may be played on Indian lands only if the tribe and the state within which the Indian lands are located have negotiated a tribal-state compact. 25 U.S.C. § 2710(d)(1)(C). Both courts concluded that MegaMania is more akin to bingo and thus should be classified as Class II gaming.
Both cases arose when the federal government sought forfeiture of MegaMania devices located on Indian lands. In each case, the court found that MegaMania machines had all of the elements of the game of bingo that were set out in the federal law. It is played for prizes with electronic cards bearing numbers; the players cover the numbers electronically by pressing the daub button; and players win by being the first to cover a designated pattern on the cards. Moreover, each court concluded that a MegaMania machine is not a gambling device within the Johnson Act15 U.S.C. §§ 1171-1178, and therefore is not a facsimile of a slot machine under IGRA. Specifically, the courts found that the machine did not deliver the element of chance, but rather that chance was supplied by the game of bingo, which took place outside of the machine. In addition, players of MegaMania play against each other, not against the machine, and the game continues until at least one of the players wins. Thus, both courts concluded that MegaMania was an aid to the playing of bingo and not a Class III gaming device.
B. Authority From Other States
To date, no cases have addressed the issue of whether state or local bingo laws authorize operation of MegaMania. However, there is at least one case and a number of opinions from attorneys general of other states that analyze the types of games that are permitted by a statute that authorizes bingo. Those opinions are instructive and demonstrate that the considerations expressed in the federal IGRA cases are also relevant to analysis of state laws concerning bingo.
Whether a specific game is bingo or a prohibited gaming device often depends on whether the players play against one another or whether they simply play against the machine. When the latter is the case, the machine is an illegal gambling device and is not authorized by a statute that allows bingo or similar games. Thus, in Kansas v. Parrish, 887 P.2d 127 (Kan. 1994), the Supreme Court of Kansas held that instant bingo was not included within a constitutional provision authorizing bingo, because instant bingo "does not have the group participation required of bingo-type games."
Various state attorneys general have cited the lack of group participation in finding that a particular game was not bingo.[4] The Mississippi Attorney General concluded that a video bingo machine in which the winner was decided by the machine itself was not "bingo" within the authorization of a Mississippi statute. Opinion of the Attorney General ofMississippi, 1992 WL 614638 (March 19, 1992). The Tennessee Attorney General concluded that video bingo was not legal under Tennessee law where there was no interaction among the participants. Opinion of the Attorney General of Tennessee, Opinion No. 85-192, 1985 WL 193741 (June 10, 1985). Finally, the Virginia Attorney General concluded that a bingo game encompassed completely within a machine was not the game of bingo authorized by a Virginia statute. Opinion of the Attorney General ofVirginia, 1978-79 Va. Op. Attorney General 173, 1979 WL 31884
(May 10, 1979). Cf. 77 Opinions of the Attorney General 82 (1992) (video lottery, in which players wager against "randomly derived game results on individual computer terminals" not authorized by the lottery statute, contrasted with keno, which is played in a social setting and not on individual computer terminals).
C. Analysis Under Maryland Law 1. Bingo under Maryland Law
In our opinion, MegaMania constitutes "bingo" as that term has traditionally been understood. The game is played against other players rather than against the machine itself. Numbered balls are drawn at random by a person from a mechanical device, not generated by the EPS. Numbers are called and matching numbers on cards are covered. The game is won when a player covers numbers in a designated pattern and announces a "bingo." The essential nature of the game remains the same even if the cards and the covering of the numbers are represented electronically, a computer rather than a master board game keeps track of the numbers that have been called, and a player presses a button on the terminal to announce a bingo rather than shout. Cf. 77 Opinions of the Attorney General
82, 85 (1992) ("The General Assembly surely did not intend that the Lottery Agency be limited to operating its lotteries in the same manner as lotteries were operated in years past, without the benefit of modern technology.").
Moreover, in our view, the nature of the game is not altered by the fact that it is being played in more than one place simultaneously. Cf. State v. C.B.S. Enterprises, 95 A.2d 16
(N.J. 1953) (Playing of simultaneous bingo at two separate, licensed locations by means of a "microphonic device" authorized by bingo statute). Thus, it is our view that MegaMania is "bingo" within the meaning of the statute.
This conclusion does not end the inquiry. A license issued under Article 27, § 259A authorizes the licensee to operate or conduct bingo within Calvert County. As MegaMania is currently played, it does not appear that the game would be operated by the licensee or that it would be conducted within Calvert County.
 2. Operation of MegaMania by the Licensee
"The word `conduct,' like the words manage and direct, suggests control." Opinion of the Attorney General of California, 67Ops. Cal. Atty. Gen. 528, 1984 WL 162106 (December 21, 1984)citing Ciro's of S.F. v. State Board of Equalization,142 Cal.App.2d 636, 639 (1956) (concluding that by installing and using player-operated computerized electronic video machines the organization relinquishes control over the game itself). Ordinarily, in the context of bingo, the operator is the person who draws and announces the numbers. See State v. Parrish,887 P.2d 127 (Kan. 1994). The licensee, it goes almost without saying, is the person to whom the license has been issued. Riderv. State, 815 P.2d 198 (Okla. 1991) citing Black's LawDictionary 921 (6th Ed. 1990). While we would not read the statute to require that the individual who holds the license be the only person who draws and calls numbers, in the context of the statute, it appears that the Legislature intended that the person drawing and calling the numbers be subject to the control of the licensee.
The Court of Appeals has noted that the favorable public view of bingo compared to other forms of gaming is attributable to the impression that it is conducted by regulated charitable entities, rather than by a "`fakir' or `nimble trickster.'" State v.Wyand, 304 Md. 721, 730, 501 A.2d 43 (1985). Thus, when a State authorizes a charitable or nonprofit organization to conduct bingo, it is generally held that the organization must conduct the bingo itself, rather than allowing it to be done by a private organization. 70 Opinions of the Attorney General 107 (1985);In re Application forBingo License of New Day Tabernacle, 801 P.2d 742 (Okla. 1990).[5] Nor is it impossible that a game of bingo could be manipulated, especially when some of the players are not physically present. See Elizabeth Lodge, No. 289 v. LegalizedGames of Chance, 170 A.2d 471 (N.J. 1961). These considerations underlie the State policy requiring the detailed regulation of gaming. Accordingly, the conduct of the game of bingo must be under the control of the person that the State has authorized to conduct the games.
In MegaMania the balls are drawn by a person who is not within the control of the licensee in any way. He or she is not employed by the licensee, subject to the management or control of the licensee, or even in a place where the licensee is fully aware of his or her actions. This delegation of the responsibility for the conduct of the game takes it outside of the authorization of the statute for the licensee to conduct bingo.
3. Play within Calvert County
An additional problem with the operation of MegaMania is that the game of bingo itself is not taking place within Calvert County, which is all that is authorized by the statute. It is our view that the Legislature, in authorizing the conduct or operation of bingo "within Calvert County," intended exactly what it said: that the authorized games must take place within Calvert County. In MegaMania the drawing of the balls and the calling of the numbers takes place in another state, beyond the control not only of the licensee, but of the State of Maryland. In addition, as the game is currently designed, players within Calvert County would be competing with players in other locations outside the State of Maryland. This renders impossible the type of regulation necessary for the appropriate conduct of gaming.
When the General Assembly has chosen to permit gambling that crosses State lines, it has expressly said so. See State Government Article, § 9-111(b) (multi-state lotteries); Business Regulation Article, § 11-804 (betting on out-of-state races); Article 27, § 363 (possession of out-of-state lottery tickets). In the absence of such authorization, such activities are illegal. 77 Opinions of theAttorney General ___ (1992); Op. No. 92-004 (January 22, 1992) (use of computer in Maryland to initiate purchase of out-of-state lottery tickets is illegal); 57 Opinions of the Attorney General
346 (1972) (possession of an out-of-state lottery ticket is a violation of law against lotteries even if it was legal where it was purchased).
 III Conclusion
In summary, it is our opinion that play of MegaMania, as described in the materials you provided, constitutes bingo and could be authorized under Article 27, § 259A, the statute that permits commercial bingo in Calvert County. However, as it is currently designed, with the drawing and calling of the numbers out-of-state by persons not under the control of the licensee, MegaMania may not be offered by Class NG licensees.
Very Truly Yours,
 J. Joseph Curran, Jr. Attorney General
 Kathryn M. Rowe Assistant Attorney General
Robert N. McDonald Chief Counsel Opinions and Advice
[1] We understand that the company that produces MegaMania may change the operation of the game so that it is conducted entirely in Calvert County and is under the control of the licensee. This opinion addresses MegaMania only as it is currently operated and described in the materials you provided.
We also understand that the company is working on additional games that could be played on the same machines as MegaMania. This opinion does not apply to any game other than the one described in the material you provided as summarized in this opinion.
[2] This description of the game is taken from the opinion inUnited States v. 103 Gaming Devices, ___ F. Supp.2d ___,1998 WL 827586 (N.D. Cal. 1998), from descriptions in advisory opinions of the Chairman of the National Indian Gaming Commission dated July 10, 1996 and July 23, 1997, and from the memorandum of Multimedia Games, the Seneca Cayuga Tribe, and the Cherokee Nation, in support of a motion for summary judgment in UnitedStates v. 162 MegaMania Gambling Devices, Civil No. 97-CV-1140-K(J) (N.D. Okla.).
[3] In addition, certain charitable and nonprofit organizations are authorized to conduct bingo and other types of gaming. See
Annotated Code of Maryland, Article 27, § 255.
[4] Other opinions have rejected all electronic play on the basis that the particular state statute requires a physical card.See Opinion of the Attorney General of California, 70 Ops.Cal. Atty. Gen. 304, 1987 WL 247256 (December 22, 1987);Opinion of the Attorney General of Alaska, 1987 Alaska Op.Atty. Gen. 327, 1987 WL 121195 (November 6, 1987). These opinions suggest that live bingo, in contrast to electronic versions, "is an open and simple game not easily manipulated" while "[t]he operation of video game bingo would not be subject to similar scrutiny and protection." Opinion of the AttorneyGeneral of California, 67 Ops. Cal. Atty. Gen. 528,1984 WL 162106 (December 21, 1984). Another opinion notes that electronic bingo made monitoring of the games more difficult for law enforcement personnel. Opinion of the Attorney General ofCalifornia, 70 Ops. Cal. Atty. Gen. 504, 1987 WL 247256
(December 22, 1987). These opinions ultimately were not based on these policy grounds, but rather on the language of statutes that precisely defined the game of "bingo" in ways inconsistent with electronic play. However, in the absence of any definition of the game "bingo" in the Maryland statutes, these decisions cannot be read as controlling.
[5] While West Bingo Corporation v. Comptroller, 1984 WL 2887
(Md. Tax. June 8, 1984) involved charitable organizations that apparently allowed a private operator to conduct bingo under their license, that case does not address the issue of whether their mode of operation was legal, but only the tax consequences of that operation.
 *Page 138